# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Kaider v. Hamos*, 2012 IL App (1st) 111109

---

| | |
|---|---|
| Appellate Court Caption | DONALD KAIDER, Plaintiff-Appellant, v. JULIE HAMOS, DIRECTOR OF THE ILLINOIS DEPARTMENT OF HEALTH AND FAMILY SERVICES; MICHELLE R.B. SADDLER, SECRETARY OF THE ILLINOIS DEPARTMENT OF HUMAN SERVICES; DAN RUTHERFORD, ILLINOIS STATE TREASURER; JUDY BAAR TOPINKA, ILLINOIS STATE COMPTROLLER, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-1109 |
| Filed | July 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff was properly denied leave to sue to enjoin the disbursement of state funds to pregnant women and children under the "All Kids" and "Moms and Babies" programs if the recipients are not lawfully in the United States, since Illinois opted out of the provision of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 barring states from extending "any State or local public benefit" to aliens "not lawfully present in the United States" by enacting state laws affirmatively providing for such eligibility, and the Illinois statutes are not impliedly conflict preempted. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-08344; the Hon. Leroy K. Martin, Jr., Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Howard W. Foster and Matthew A. Galin, both of Foster P.C., of Chicago, for appellant. |
|---|---|
| | Lisa Madigan, Attorney General, of Chicago (Michael Scodro, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), for appellees. |
| Panel | PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion. |
| | Justices McBride and Howse concurred in the judgment and opinion.* |

**OPINION**

¶ 1    Plaintiff Donald Kaider appeals from the circuit court's denial of his petition for leave to file a taxpayer's suit to enjoin the disbursement of state funds under section 11-303 of the Code of Civil Procedure (735 ILCS 5/11-303 (West 2008)). In his proposed complaint, plaintiff seeks to enjoin the provision of health benefits to pregnant women and children who are not lawfully present in the United States under two state programs, "All Kids" and "Moms & Babies." Plaintiff argues that providing benefits to pregnant women and children who are not lawfully present in the United States is prohibited by 8 U.S.C. § 1621(a), enacted as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub. L. No. 104-193, 110 Stat. 2105 (1996)), which generally bars states from extending "any State or local public benefit" to aliens "not lawfully present in the United States." 8 U.S.C. § 1621(a), (d) (2006). Defendants respond that the Illinois General Assembly opted out of the benefits bar pursuant to 8 U.S.C. § 1621(d), which allows a state to provide benefits to unlawful aliens[1] "through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." The circuit court agreed with defendants, finding that the General Assembly opted out of section 1621(a) pursuant to 8 U.S.C. § 1621(d). For the reasons that follow, we affirm.

_____

[1]While 8 U.S.C. § 1621(d) refers to aliens "not lawfully present in the United States," we shorten that rather bulky phrase to the term "unlawful aliens" in this opinion. See *Martinez v. Regents of the University of California*, 241 P.3d 855, 862 (Cal. 2010) (noting that terms such as " 'illegal alien' " may be pejorative to some, who prefer the term " 'undocumented immigrant,' " but using the term "unlawful alien" in order to remain "neutral, yet as accurate, as possible," with regard to the statutory language).

*Justice Joseph Gordon participated in this case at oral arguments. Following his passing, Justice McBride has replaced him on the panel and has reviewed the briefs and oral argument recordings.

¶ 2                                        BACKGROUND

¶ 3        Plaintiff filed his petition for leave to file a taxpayer suit in the circuit court against several state officials who are responsible for disbursing, maintaining, and securing state funds: Julie Hamos, Director of the Illinois Department of Health and Family Services; Michelle R. B. Saddler, Secretary of the Illinois Department of Human Services; Dan Rutherford, Illinois State Treasurer; and Judy Baar Topinka, Illinois State Comptroller. Plaintiff challenged the use of state funds under two healthcare benefits programs: the All Kids health insurance program, part of the Covering ALL KIDS Health Insurance Act (All Kids Act) (215 ILCS 170/1 to 99 (West 2008)), and the Moms & Babies program, authorized under sections 1-11 and 12-4.35 of the Illinois Public Aid Code (305 ILCS 5/1-1, 12-4.35 (West 2008)).

¶ 4        At this stage, we take all well-pled facts in the taxpayer complaint as true (*Daly v. County of Madison*, 378 Ill. 357, 359 (1941)), though here the relevant facts–describing the operation of the programs at issue–are not in dispute. The All Kids and Moms & Babies programs are an outgrowth of Illinois's Medicaid program and the Children's Health Insurance Program (CHIP), which provide medical assistance to low income children and their families. To be eligible for Medicaid, recipients generally must earn income of no more than 133% of the federal poverty guidelines (see 42 U.S.C. § 1396a(*l*)(2)(B) (2006)) and must be citizens or otherwise fall within several categories of lawful aliens (42 U.S.C. § 1396b(v)(1) (2006); 305 ILCS 5/1-11 (West 2008)). In 1998, the General Assembly created CHIP, which supplements Illinois's Medicaid program by providing health insurance coverage to children of families earning between 133% and 200% of the federal poverty guidelines. See 215 ILCS 106/20(a)(2) (West 2008). Similar to the Medicaid program, CHIP limits benefits to United States citizens and several categories of lawfully resident aliens. 215 ILCS 106/20(a)(3), (a)(4) (West 2008).

¶ 5        The Moms & Babies and All Kids programs are administered through a single application by the Illinois Department of Healthcare and Family Services (Department). The Moms & Babies program provides benefits for pregnant women and their babies, including the mother's outpatient and inpatient hospital services during pregnancy and for 60 days after the baby is born. See http://www.allkids.com/pregnant.html (referenced in plaintiff's proposed complaint). The family income limit for Moms & Babies is 200% of the federal poverty guidelines. *Id.* The recipient mother does not need to be a United States citizen or legal alien to receive benefits under the program. *Id.* The All Kids program offers uninsured children subsidized health insurance that covers immunizations, doctor visits, hospital stays, and prescription drugs. See 215 ILCS 170/1 (West 2008). The Department is required to coordinate the All Kids program with existing health programs (see 215 ILCS 170/15 (West 2008)), though the All Kids Act extends coverage to children of families earning between 200% and 300% of the federal poverty guidelines. 215 ILCS 170/20(a) (West 2008). The All Kids Act places no limits on the receipt of benefits by unlawful aliens.

¶ 6        In his proposed complaint, plaintiff alleges, and defendants do not dispute, that pregnant women and children without lawful immigration status receive benefits under the Moms & Babies and All Kids programs. While plaintiff argued in the circuit court that extending medical services to unlawful aliens under the Moms & Babies and All Kids violates 8 U.S.C.

§ 1621(a), which generally bars unlawful aliens from receiving state or local public benefits, the circuit court disagreed. The court denied plaintiff's petition to file the proposed complaint, finding that there was no reasonable ground for the filing of such action because the statutes authorizing the Moms & Babies and All Kids programs "affirmatively provide[ ]" for the extension of benefits to unlawful aliens, as required by 8 U.S.C. § 1621(d). This appeal followed.

¶ 7                                                ANALYSIS

¶ 8      On appeal, plaintiff again argues that the Illinois statutes authorizing the All Kids and Moms & Babies programs violate 8 U.S.C. § 1621(a)–and do not satisfy the requirements of 8 U.S.C. § 1621(d)–because the Illinois statutes do not affirmatively provide that unlawful aliens are eligible for state medical benefits. Alternatively, plaintiff contends that the Illinois statutes are preempted by federal law. Under section 11-303 of the Code of Civil Procedure, a circuit court may deny leave to file the complaint if the court is not "satisfied that there is reasonable ground for the filing of such action." 735 ILCS 5/11-303 (West 2008). Plaintiff asserts, and defendants do not contest, that if the All Kids or Moms & Babies programs violate federal law (or are preempted by federal law), those programs would constitute a misuse of public funds under section 11-303. See *Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 493-94 (2005) ("It has long been the rule in Illinois that citizens and taxpayers have a right to enjoin the misuse of public funds ***. The misuse of these funds for illegal or unconstitutional purposes is a damage which entitles them to sue."). The parties also agree that in this case compliance with this standard depends on whether the state laws at issue comply with the 8 U.S.C. § 1621(d), which in turn depends on our construction of that statute's language. This court reviews questions of statutory construction *de novo*. *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23. We may affirm the circuit court's judgment on any ground supported by the record. *Eychaner v. Gross*, 202 Ill. 2d 228, 262 (2002).

¶ 9                                          8 U.S.C. § 1621(d)

¶ 10     Section 1621 was enacted as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRA). Pub. L. No. 104-193, § 411, 110 Stat. 2105 (1996). "The PRA creates a comprehensive statutory scheme for determining aliens' eligibility for federal, state and local benefits and services. It categorizes all aliens as 'qualified' or not 'qualified' and then denies public benefits based on that categorization." *League of United Latin American Citizens v. Wilson*, 997 F. Supp. 1244, 1251-52 (C.D. Cal. 1997). As relevant here, the PRA establishes a general prohibition against extending state and local benefits to aliens who are not lawfully present in the United States:

"Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not–

(1) a qualified alien (as defined in section 1641 of this title),

(2) a nonimmigrant under the Immigration and Nationality Act [citation], or

-4-

(3) an alien who is paroled into the United States under 212(d)(5) of such Act [citation] for less than one year,

is not eligible for any State or local public benefit (as defined in subsection (c) of this section)." 8 U.S.C. § 1621(a) (2006).

Section 1621(b) recognizes exceptions to this benefits bar for certain categories of state and local benefits, including immunizations and emergency labor and delivery. 8 U.S.C. § 1621(b). Additionally, section 1621(d) describes the circumstances under which a state may extend benefits to unlawful aliens:

"A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d).

¶ 11 The central question in this appeal is whether the provisions governing the All Kids and Moms & Babies programs "affirmatively provide[ ]" eligibility to undocumented aliens under 8 U.S.C. § 1621(d). Before examining the Illinois statutes authorizing those programs, we must determine what Congress required of the states in section 1621(d). As in every case of statutory construction, we strive to "ascertain and give effect to the legislature's intent." See, *e.g.*, *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23 (citing *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006)). At the outset, we note our agreement with the parties that the statute is not ambiguous and thus the statute's text, not legislative history, must guide our resolution of this case. See, *e.g.*, *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 397-98 (2003). Statutory ambiguity is not created simply because the parties disagree, and absent ambiguity in the language of the statute, there is no basis to delve into the conference reports or statements of legislators to resolve the dispute in this case. Our task, then, is to give the statutory text "its plain, ordinary, and popularly understood meaning." *Gardner v. Mullins*, 234 Ill. 2d 503, 511 (2009).

¶ 12 Where section 1621(d) left the term "affirmatively" undefined, we may consult a dictionary to ascertain the plain and ordinary meaning of that term. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 60. Webster's Third New International Dictionary defines the adjective "affirmative" as: "asserting that the fact is so"; "declaratory of what exists"; or "assertive, positive." Webster's Third New International Dictionary 36 (1986). Both parties draw on these definitions and give the statute a similar construction. Plaintiff contends that "affirmatively provides" means "positively assert," while defendants argue that "the term 'affirmatively' *** ordinarily means a positive statement." With those definitions in hand, the parties disagree, however, on what section 1621(d) actually requires. According to plaintiff, the state law must expressly or specifically reference "illegal aliens" (or use a similar term, such as "undocumented alien"). Defendants contend that section 1621(d) is satisfied by any state law that is an "unambiguous and positive" expression of legislative intent to provide coverage for unlawful aliens and opt out of section 1621(a), even if the statute does not use the term "illegal aliens" or some similar term.

¶ 13 Plaintiff's argument that the statute requires "specific" or "express" reference to "illegal

aliens" is rooted in what he asserts was Congress's purpose for section 1621(d): for state legislatures to put citizens on notice that public resources are being spent on unlawful aliens. We agree that our construction of statutory language is informed by "the objective which the statute sought to accomplish and the evil it was desired to remedy." *People v. Moffitt*, 138 Ill. App. 3d 106, 118 (1985) (citing *City of Springfield v. Board of Election Commissioners*, 105 Ill. 2d 336, 341 (1985)). But we disagree with plaintiff's understanding of the objective of section 1621(d).

¶ 14    To support his public notice theory, plaintiff relies on the decision of the California Court of Appeals, which reasoned that section 1621(d) was meant to "put the public on notice that tax dollars are being used to benefit illegal aliens." *Martinez v. Regents of the University of California*, 83 Cal. Rptr. 3d 518, 544 (Cal. Ct. App. 2008) (noting that the statute was meant to ensure "democratic accountability, forcing state legislators to take public responsibility for their actions"), *rev'd*, 241 P.3d 855 (Cal. 2010). Initially, we note that the California Supreme Court soundly rejected the court of appeals' conclusion that the California law ran afoul of section 1621(d) because it opted out of section 1621(a) in a " 'convoluted manner.' " See *Martinez*, 241 P.3d at 867-68. We also see no basis in the statutory text to conclude that Congress intended to impose a public notice requirement. In passing the PRA, Congress effectively invalidated all existing state laws, regulations, or executive orders that extended state or local benefits to unlawful aliens, based on Congress's asserted interest in "remov[ing] the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6) (2006). The prohibition of benefits to unlawful aliens was not absolute, however. Congress recognized a need to give the states autonomy–or as the title of section 1621(d) describes it, "authority"–to provide benefits to aliens not lawfully present in the United States. 8 U.S.C. § 1621(d). Where Congress did not require reference to section 1621(d) or "express" or "specific" reference to "illegal aliens," the better understanding of the requirement that the state law "affirmatively provides" for eligibility of undocumented aliens is that Congress wanted to prevent the passive or inadvertent override of section 1621(a).

¶ 15    Indeed, section 1621(d) could have, but does not, require a "specific" or "express" reference to "illegal aliens," "undocumented aliens," or any similar term. Affirmative language does not equate with specific or express language. See Webster's Third New International Dictionary 803 (1986) (defining "express" as "directly and distinctly stated or expressed rather than implied or left to inference"; "not dubious or ambiguous"; "definite, clear, explicit, unimstakable"; "exactly represented"); *id.* at 2187 (defining "specific" as "constituting or falling into the category specified"; "characterized by precise formulation or accurate restriction (as in stating, describing, defining, reserving)"; or "free from such ambiguity as results from careless lack of precision or from omission of pertinent matter"). As defendants explain, Congress has shown its understanding of the distinction between affirmative and specific language. See, *e.g.*, 12 U.S.C. § 36(c) (2006) (allowing national banks to establish banking branches "if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language *specifically* granting such authority *affirmatively* and not merely by implication or recognition" (emphases added)); 18 U.S.C. § 3553(b)(2)(A)(ii)(I) (2006) (permitting federal courts to

depart from sentencing guidelines where mitigating circumstances have "been affirmatively and specifically identified").

¶ 16    Section 1621(d) also does not require that the state statute expressly reference the federal provision–the best way to put Congress on notice of the extension of benefits to unlawful aliens. Again, Congress has shown that it knows how to require reference to a specific provision, as Congress has often imposed requirements on states seeking to legislate in a certain area. See, *e.g.*, 15 U.S.C. § 80a-3a(c) (2006) ("Notwithstanding subsections (a) and (b) of this section *** a State may enact a statute that *specifically refers to this section* and provides prospectively that this section shall not preempt the laws of that State referred to in this section." (Emphasis added.)); see also *Martinez*, 241 P.3d at 867 ("Congress has shown it knows how to require a state specifically to reference a federal law when it wishes to do so, because it has done just that numerous times.").

¶ 17    Congress could have easily imposed these conditions–requiring the state legislature to specifically refer to "illegal aliens" or some similar term or requiring reference to subsection (d)–in order to put the public on notice of the extension of benefits to unlawful aliens. Instead, Congress provided states the authority to opt out of section 1621(a) without imposing those requirements, and this court is not free to read into statutes limitations or conditions not expressed by the legislature. See *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994) ("Where an enactment is clear and unambiguous, as this one is, a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express."). We therefore agree with defendants that section 1621(d) is satisfied by any state law that conveys a positive expression of legislative intent to opt out of section 1621(a) by extending state or local benefits to unlawful aliens. Where Congress has shown that it knows how to require states to expressly reference a federal statute, and it could have easily proscribed the exact wording of the state law, we conclude that Congress did not intend to impose those conditions by using the less restrictive language of section 1621(d).

¶ 18    Plaintiff nevertheless claims that two cases in the state appellate courts have endorsed his construction of the statute and should serve as persuasive authority for this court. First, plaintiff relies on the decision of the Florida appellate court in *Department of Health v. Rodriguez*, 5 So. 3d 22 (Fla. Dist. Ct. App. 2009). While the Florida court determined that the statutes governing Florida's brain and spinal cord injury (BSCI) program did not meet the requirements of section 1621(d), we find that decision inapposite. The only questions discussed on appeal in *Rodriguez* were whether BSCI benefits were "State or local public benefits" under the PRA and whether the BSCI program was exempt under other sections of the PRA. See *id.* at 25-26. Once the court concluded that the PRA applied to the BSCI program, the "affirmatively provides" language of section 1621(d) was never at issue because the Florida legislature simply had not enacted any law after August 22, 1996 in response to the PRA. The governing provisions of the BSCI program were enacted in 1994, renumbered in 1999, and certain sections were amended in 2000, but the appellant could point to no law enacted after August 22, 1996 that touched on the citizenship requirements to satisfy section 1621(d). *Id.* Plaintiff relies on the *Rodriguez* court's statement that "[a]t no time since

-7-

August 22, 1996, the date provided for in section 1621(d), has the Legislature enacted a law *specifying that illegal aliens are eligible for the BSCI Program*." (Emphasis added.) *Id.* at 26. Focusing on the italicized language, plaintiff argues that the Florida court decided that the state law must specifically reference "illegal aliens" or some other term to comply with section 1621(d). We do not take this single sentence in the opinion as a definitive construction of the "affirmatively provides" language in section 1621(d). The court was never asked to construe that language, did not discuss the meaning of "affirmatively provides," and never examined the statutory language of any Florida statute to determine compliance with section 1621(d). *Rodriguez* provides no answers to the question presented in this case.

¶ 19    Plaintiff next relies on the California Supreme Court's decision in *Martinez v. Regents of the University of California*, 241 P.3d 855 (Cal. 2010). In that case, the court considered a California education statute, section 68130.5, which provided that " 'a person without lawful immigration status' " could be exempt from paying nonresident tuition at California state colleges and universities under certain circumstances. 241 P.3d at 866 (quoting Cal. Educ. Code § 68130.5). Among other challenges to the law, the plaintiffs argued that section 68130.5 violated 8 U.S.C. § 1621(a) and did not meet the requirements of section 1621(d). The court first rejected the contention that the state law at issue must specifically reference "title 8 U.S.C. section 1621" based on statements in the legislative history; the court refused to "read[ ] into a statute language it does not contain or elements that do not appear on its face." *Martinez*, 241 P.3d at 867. The court further stated:

> "Section 1621 requires no specific words, and certainly not the specific words 'illegal alien,' which not even section 1621 uses. We agree with the Regents' argument that 'in order to comply, the state statute must expressly state that it applies to undocumented aliens, rather than conferring a benefit generally without specifying that its beneficiaries may include undocumented aliens.' " *Id.* at 868.

The court thus concluded that the California statute under consideration, referencing persons "without lawful immigration status," clearly complied with section 1621(d). *Id.*

¶ 20    Relying on *Martinez*, plaintiff contends that section 1621(d) requires express reference to "illegal aliens" or a similar term. We disagree. Initially, we note our agreement with this decision in *Martinez* insofar as it holds that conferring a benefit generally, without any indication that the legislature intends to opt out of section 1621(d) and extend coverage to unlawful aliens, would not satisfy that statute. *Id.* We also agree with the court's conclusion that "[s]ection 1621 requires no specific words." *Id.* To the extent that the California Supreme Court's holding requires an express reference to "illegal aliens" or "undocumented alien," "aliens without lawful immigration status," "aliens not lawfully present," or some similar term, however, we depart from the court's decision. There is no requirement in the statute for an express or specific reference to undocumented aliens, even if the statute before the court in *Martinez* provided such a reference. As discussed above, section 1621 establishes that states have the authority to provide benefits, so long as there is a positive expression of intent to opt out of section 1621(a) and provide benefits to unlawful aliens. This ensures that the state legislature does not inadvertently override the bar established in section 1621(a). Accordingly, to comply with section 1621(d), the statutes underlying the All Kids and Moms

& Babies programs must positively and unambiguously evidence the legislative intent to opt out of section 1621(a) and provide coverage for unlawful aliens. We now consider whether the Illinois statutes meet that test.

¶ 21                               The Moms & Babies Program

¶ 22      There is no dispute that the state laws authorizing the Moms & Babies program, sections 1-11 and 12-4.35 of the Illinois Public Aid Code (305 ILCS 5/1-11, 12-4.35 (West 2008)), were enacted after August 22, 1996. Section 1-11 of the Public Aid Code, which became effective July 1, 1997, provides:

> "To the extent not otherwise provided in this Code or federal law, all clients who receive cash or medical assistance under Article III, IV, V, or VI of this Code must meet the citizenship requirements as established in this Section. To be eligible for assistance an individual, who is otherwise eligible, must be either a United States citizen or included in one of the following categories of non-citizens:
>
>> [listing several categories of legal noncitizens]
>
> The Illinois Department may, by rule, cover prenatal care or emergency medical care for non-citizens who are not otherwise eligible under this Section. Local governmental units which do not receive State funds may impose their own citizenship requirements and are authorized to provide any benefits and impose any citizenship requirements as are allowed under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (P.L. 104-193)." 305 ILCS 5/1-11 (West 2008).

Similarly, section 12-4.35 of the Illinois Public Aid Code, which became effective July 1, 1998, provides:

> "Notwithstanding Section 1-11 of this Code or Section 20(a) of the Children's Health Insurance Program Act, the Department of Healthcare and Family Services may provide medical services to noncitizens who have not yet attained 19 years of age and who are not eligible for medical assistance under Article V of this Code or under the Children's Health Insurance Program created by the Children's Health Insurance Program Act due to their not meeting the otherwise applicable provisions of Section 1-11 of this Code or Section 20(a) of the Children's Health Insurance Program Act. The medical services available, standards for eligibility, and other conditions of participation under this Section shall be established by rule by the Department ***." 305 ILCS 5/12-4.35 (West 2008) (referencing Medicaid immigration standards (305 ILCS 5/1-11 (West 2008)) and CHIP immigration standards (215 ILCS 106/20(a) (West 2008))).

¶ 23      Initially, we note that section 1-11 (which is also referenced in section 12-4.35), became effective just one year after PRA and explicitly references "the Personal Responsibility and Work Opportunity Reconciliation Act of 1996." The General Assembly was therefore clearly cognizant that the PRA imposed requirements on the distribution of public benefits in Illinois. In fact, the legislature directed local government units to "impose their own citizen requirements" as to the distribution of purely local benefits only if they were "allowed" under the PRA. 305 ILCS 5/1-1 (West 2008). As to state public benefits, the General Assembly established a list of legal noncitizens who could receive a wide array of benefits and services.

-9-

For the much smaller subset of benefits at issue in this case–"prenatal care" in section 1-11 and "medical services" for those under 19 in section 12-4.35–the General Assembly extended coverage to "noncitizens" who were not otherwise eligible (*i.e.*, any noncitizens who did not fall into the categories listed in the statute who were eligible for the wider range of benefits). The term "noncitizen" used in section 1-11 and section 12-4.35, left unmodified by the statute, is certainly broad enough to extend to unlawful aliens. See *Economy Packing Co. v. Illinois Workers' Compensation Comm'n*, 387 Ill. App. 3d 283, 288-89 (2008) ("When unmodified, the term 'alien' is broad enough in scope to encompass any 'person who resides within the borders of a country but is not a citizen or subject of that country.' [Citation.]"). Where the General Assembly, clearly aware of the PRA, enacted legislation that extended a small class of benefits to all noncitizens, without limitation, who were not otherwise eligible, we conclude that sections 1-11 and 12-4.35 evidence the positive legislative intent required by section 1621(d) to opt out of section 1621(a) and provide coverage for unlawful aliens.

¶ 24    Plaintiff argues that these statutes do not comply with section 1621(d) because the State has delegated the implementation of the opt-out to the Department of Healthcare and Family Services (Department), an administrative agency.[2] We disagree. Sections 1-11 and 12-4.35 *are* the "state laws enacted after August 22, 1996" that express the legislature's intent to opt out of section 1621(a). Through those statutes, the legislature has clearly expressed its intent to opt out of the benefits bar in section 1621(a), and nothing in section 1621(d) prevents state legislatures from delegating the implementation of the opt-out to administrative agencies once it affirmatively provides for it in the state statute. Plaintiff's argument again depends on his theory that compliance with section 1621(d) is determined by whether the public has adequately been put on notice: he contends that "trying to follow/understand these obscure rules/regulations, which reference numerous other statutes is extraordinarily difficult and confusing for the general public." This is not the test for compliance with section 1621(d). Here, by passing a statute that positively conveys the intent to opt out of section 1621(a), the General Assembly has fully complied with section 1621(d) with respect to the benefits offered under the Moms & Babies program.

¶ 25                   The All Kids Program

¶ 26    Plaintiff additionally challenges the benefits extended to children under the All Kids program. The foregoing discussion regarding the Moms & Babies program largely forecloses plaintiff's argument. Section 12-4.35 of the Public Aid Code vests the Department with the

---

[2]The operative administrative rule is title 89, section 118.500, of the Illinois Administrative Code (89 Ill. Adm. Code 118.500 (2012)), which provides that noncitizen children under 19 years of age may be eligible for benefits under Medicaid and CHIP, even if they do not fall into the into the categories of legal resident aliens allowed for those programs. We agree with defendants that it is consistent with the legislative intent expressed in sections 1-11 and 12-4.35 to construe section 118.500 as authorizing prenatal care for pregnant women. These statutes establish the legislative directive to the Department of Healthcare and Family Services to opt out of section 1621(a) and cover prenatal care for expectant mothers, regardless of immigration status.

authority, by rule, to "provide medical services to noncitizens who have not yet attained 19 years of age and who are not eligible for medical assistance" because of Medicaid and CHIP immigration requirements (see 305 ILCS 5/12-4.35 (West 2008)), and the Department has carried out that directive in section 118.500 of title 89 of the Administrative Code (89 Ill. Adm. Code 118.500 (2012)). As explained above, section 12-4.35 evidences the legislative intent to opt out of section 1621(a) and provide coverage for children who meet the income requirements of the Medicaid and CHIP programs, regardless of their immigration status.

¶ 27    Plaintiff nevertheless argues that because section 12-4.35 only applies to benefits to children who meet the income requirements of the Illinois Public Aid Code or CHIP, it does not extend to benefit levels under the All Kids Act. Defendants acknowledge that the All Kids Act provides health insurance coverage to Illinois children living in households with incomes 200% to 300% above federal poverty guidelines (*i.e.*, beyond the income requirements of Medicaid or CHIP). See 215 ILCS 170/20(a) (West 2008). In the All Kids Act, however, the General Assembly established that "[i]t is *** the intent of this legislation to provide access to affordable health insurance to all uninsured children in Illinois." 215 ILCS 170/5 (West 2008); see also *id.* ("The General Assembly finds that, for the economic and social benefit of all residents of the State, it is important to enable *all children* of this State to access affordable health insurance that offers comprehensive coverage and emphasizes preventive healthcare." (Emphasis added.)).

¶ 28    Thus, after the General Assembly expressed its intent to opt out of section 1621(a) by providing benefits to unlawful alien children at the income levels of the Medicaid and CHIP programs, the General Assembly positively established its intent to allow "*all children* of this State to access affordable health insurance." (Emphasis added.) 215 ILCS 170/5 (West 2008). While the All Kids Act raised the income threshold for eligibility beyond the limits of Medicaid and CHIP, it also imposed no immigration or citizen requirements for the All Kids program. Instead, the All Kids Act used unlimited and broad language, referencing "all kids." When the General Assembly used such broad and unmodified language, especially after extending Medicaid and CHIP benefits to noncitizen children under section 12-4.35, we conclude that the All Kids Act conveys the legislature's unambiguous and positive expression of intent to cover children who otherwise meet the income requirements of that act, regardless of immigration status. See, *e.g.*, *Ali v. Federal Bureau of Prisons*, 552 U.S. 215, 221 (2008) ("Congress could not have chosen a more all-encompassing phrase than 'any other law enforcement officer' to express [its] intent."); *Potts v. Department of Registration & Education*, 145 Ill. App. 3d 960, 965 (1986) (finding the term "any" in a statute should be read without limitation to void imposing restrictions into the statute). As with section 12-4.35, the All Kids Act positively establishes the legislature's intent to opt out of section 1621(a) by extending benefits to children without lawful immigration status.

¶ 29                                          Implied Conflict Preemption

¶ 30    Finally, plaintiff argues that even if the Illinois statutes discussed above comply with section 1621(d), they nonetheless constitute a misuse of public funds because they are preempted by federal law. Under the supremacy clause of the United States Constitution,

federal law preempts state law in any one of the following three circumstances: "(1) express preemption–where Congress has expressly preempted state action; (2) implied field preemption–where Congress has implemented a comprehensive regulatory scheme in an area, thus removing the entire field from the state realm; or (3) implied conflict preemption–where state action actually conflicts with federal law." *Carter v. SSC Odin Operating Co.*, 237 Ill. 2d 30, 39-40 (2010). Here, plaintiff argues that the state statutes are "conflict preempted" because they present an "unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Internal quotation marks omitted.) *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009); *Carter*, 237 Ill. 2d at 40. Plaintiff contends that the state laws discussed above directly conflict with 8 U.S.C. § 1324(a)(1)(A)(iv) and 8 U.S.C. § 1601(6). Under section 1324(a)(1)(A)(iv), it is a crime for any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv) (2006). 8 U.S.C. § 1601(6) provides that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6) (2006).

¶ 31 Plaintiff's preemption claim runs into a significant hurdle: the plain language of section 1621. While section 1621(a) establishes a *general* bar against state and local benefits to unlawful aliens, section 1621(d) expressly states that a state "may" provide public benefits if the state complies with the statutory requirements. Plaintiff responds that section 1621(d) does not end the preemption inquiry because the United States Supreme Court has held that a saving clause "does *not* bar the ordinary working of conflict pre-emption principles." (Emphasis in original.) *Geier v. Honda American Motor Co.*, 529 U.S. 861, 869 (2000). In *Geier*, the Supreme Court held that a federal safety standard, which gave car manufacturers a "range of choices" in installing passive restraint systems, impliedly preempted a tort suit that created a duty for defendant-manufacturers to install air bags. 529 U.S. at 874-75. The federal law at issue in *Geier* contained a clause expressly preempting state regulations, along with a saving clause, which provided that " '[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under common law.' " *Id.* at 868 (citing 15 U.S.C. § 1397(k)). The Court determined that the saving clause was not broad enough to save every state tort action, for "[n]othing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations." *Id.* at 869. The Court concluded that the duty recognized by the state court "presented an obstacle to the variety and mix of devices that the federal regulation sought" and was therefore preempted by the federal safety standard. *Id.* at 881.

¶ 32 It is true that section 1621(d) is a sort of "saving clause," in that it is an "exception of a special thing out of the general things mentioned in the statute." Black's Law Dictionary 1343 (6th ed. 1990). But the saving clause at issue in *Geier* was limited, establishing "room for state tort law to operate" and foreseeing "the possibility that a federal safety standard will pre-empt a state common-law tort action with which it conflicts." *Geier*, 529 U.S. at 868, 870. In contrast, while Congress has expressed a "compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits" (8 U.S.C. § 1601(6) (2006)), it has also recognized exceptions to this general prohibition, despite the

possible incentive that these exceptions might create. Under 8 U.S.C. § 1621(b), for example, unlawful aliens may receive certain state and local benefits, including immunizations and emergency labor and delivery. Under section 1621(d), a state "may" provide public benefits for unlawful aliens if it meets the requirements of that section. Section 1621 thus strikes a balance between federal interests and state interests by giving the states authority to act despite the federal interest in discouraging illegal immigration expressed in section 1324(a)(1)(A)(iv) and section 1601(6).

¶ 33    Plaintiff takes the argument further, claiming that the programs here conflict with federal law because they allow unlawful aliens "medical benefits on a long-term basis, and with no limits on the amount of benefits received." But section 1621(d) recognizes no such limits on the duration, extent, or quantity of state or local benefits that states may provide. As we have explained above, the Illinois statutes comply with the minimal conditions set out in section 1621(d). Where Congress provided the states with broad authority to extend state and local benefits to those not lawfully present in the United States, we conclude that "Congress did not impliedly prohibit what it expressly permitted." *Martinez*, 241 P.3d at 869 (finding no implied conflict preemption or field preemption for California benefits law in light of Congress's express permission for states to extend benefits in section 1621(d)). The Illinois statutes are not impliedly conflict preempted.

¶ 34                                CONCLUSION

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court.


¶ 36    Affirmed.