# Illinois Official Reports

## Appellate Court

*Turner v. Orthopedic & Shoulder Center, S.C.*, 2017 IL App (4th) 160552

| | |
|---|---|
| Appellate Court Caption | CASSANDRA TURNER, Plaintiff-Appellant, v. ORTHOPEDIC AND SHOULDER CENTER, S.C., Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-16-0552 |
| Filed<br>Modified upon<br>denial of rehearing | July 6, 2017<br><br>August 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-L-25; the Hon. Rebecca Simmons Foley, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | James P. Ginzkey, of Bloomington, for appellant.<br><br>Peter W. Brandt and Rachel J. Brandt, of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion.<br>Presiding Justice Turner and Justice Knecht concurred in the judgment and opinion. |

¶ 1    Plaintiff, Cassandra Turner, brought this action against defendant, Orthopedic and Shoulder Center, S.C., for consumer fraud (see 815 ILCS 505/1 *et seq.* (West 2014)) and intentional infliction of emotional distress (see Restatement (Second) of Torts § 46 (1965)). Both theories were premised on defendant's charging her more for medical services than the amounts that defendant had agreed to charge, in its contract with plaintiff's health insurer, Blue Cross Blue Shield of Illinois (Blue Cross). The allegedly fraudulent charge was in the form of a health-care services lien that defendant asserted against the settlement proceeds in plaintiff's personal-injury case (Turner v. Simpsen, No. 14-L-176 (Cir. Ct. McLean Co.)). See 770 ILCS 23/10 (West 2014).

¶ 2    Defendant moved for a summary judgment on both theories, and the trial court granted the motion. In the same order, the court denied a petition by plaintiff to adjudicate defendant's lien to be zero. See 770 ILCS 23/30 (West 2014). Plaintiff appeals.

¶ 3    In our *de novo* review of the summary judgment, we reach the following conclusions. First, plaintiff has forfeited her theory of intentional infliction of emotional distress because, in her opening brief, she makes no reasoned argument in support of that theory. Second, asserting the health-care services lien was a breach of contract, but it was not consumer fraud. Therefore, we affirm the summary judgment on the two counts of the second amended complaint, but we reverse the denial of plaintiff's "Petition To Adjudicate Lien to Zero." We also deny defendant's petition for rehearing.

¶ 4                            I. BACKGROUND
¶ 5                  A. The "Participating Provider Agreement"
¶ 6    On March 30, 2011, defendant entered into a "Participating Provider Agreement" with Blue Cross. Lawrence Li signed the agreement on behalf of defendant, and Stephen F. Hammen, a vice president, signed it on behalf of Blue Cross.

¶ 7    In the "Participating Provider Agreement," defendant agrees to accept Blue Cross insurance as full payment for any covered service it renders to Blue Cross patients. This understanding between defendant and Blue Cross is expressed, for instance, in article IV, paragraph 3(A), of the agreement (in which the "Contracting Provider" is defendant and the "Plan" is Blue Cross):

> "(A) The Contracting Provider agrees to accept the Plan's Usual and Customary Fee allowance as full payment for each service covered by the Plan Insured's Usual and Customary Contract, and the total amount payable by both the Plan and the Plan Insured, when the Plan Insured has any deductible, coinsurance[,] or co-payment balance for which the Plan Insured is responsible, shall not exceed the Plan's Usual and Customary Fee determination."

¶ 8    Article IV, paragraph 7, negates defendant's right, under any circumstances, to seek payment from the patient for covered services, except for copayments and deductibles:

> "7. The Contracting Provider agrees that in no event, including, but not limited to, nonpayment by the Plan of the amounts due the Contracting Provider under this contract, insolvency of the organization[,] or any breach of this contract by the organization, shall the Contracting Provider or its assignees or subcontractors have a

right to seek any type of payment from, bill, charge, collect a deposit from, or have any recourse against (i) the Covered Person; (ii) persons acting on the Covered Person's behalf (other than the Plan); and/or (iii) the employer or group contract holder for services provided pursuant to this Agreement, except for the payment of applicable copayments or deductibles for services covered by the Plan or fees for services not covered by the Plan. The requirements of this clause shall survive any termination of this Agreement for services rendered prior to such termination, regardless of the cause of such termination. The Covered Persons, the persons acting on the Covered Person's behalf (other than the Plan)[,] and the employer or group contract holder shall be third party beneficiaries of this clause. This clause supersedes any oral or written agreement now existing or hereafter entered into between the Contracting Provider and the Covered Person, persons acting on the Covered Person's behalf (other than the Plan)[,] and the employer or group contract holder."

¶ 9
## B. The Motor Vehicle Accident
### and the Consequent Medical Treatment

¶ 10 On July 14, 2014, plaintiff was involved in a motor vehicle accident, in which she sustained injuries.

¶ 11 From July to October 2014, defendant treated her for these injuries.

¶ 12
## C. The Notices of Lien

¶ 13 On July 16, 2014, defendant sent a notice of a health-care services lien in the amount of $19,877.29 to Progressive Casualty Insurance Company, which was plaintiff's automobile insurer.

¶ 14 On July 17, 2014, defendant sent a notice of lien in the revised amount of $19,847.29 to Country Financial, which was the tortfeasor's automobile insurer.

¶ 15 On September 19, 2014, defendant sent a notice of lien in the revised amount of $30,048.55 to Country Financial.

¶ 16 On December 17, 2014, defendant sent a notice of lien in the revised amount of $34,027.40 to Country Financial.

¶ 17 Defendant sent none of these notices to either plaintiff or the alleged tortfeasor, Aja Simpsen.

¶ 18
## D. Blue Cross Pays Defendant at the Discounted Rate, and
### Without Being Asked To Do So, Defendant Pays Blue Cross Back

¶ 19 Plaintiff had Blue Cross health insurance. Defendant billed Blue Cross a total of $29,008.55 for its treatment of plaintiff. Blue Cross's usual and customary allowance, however, was only $6495.63, so that is the amount it paid defendant.

¶ 20 After cashing the check from Blue Cross, defendant paid Blue Cross back, although Blue Cross never requested that defendant do so. Defendant issued one check to Blue Cross in the amount of $6093.44 and another check in the amount of $402.19. ($6093.44 plus $402.19 equals $6495.63.)

### E. The Tort Action and Its Settlement

On November 2, 2014, plaintiff, by her attorney, James Ginzkey, filed a personal-injury action, in which she named Simpsen as the person who was liable for the injuries she had sustained in the automobile accident.

On December 16, 2014, plaintiff settled the personal-injury case. Ginzkey deposited the settlement proceeds into a trust account, pending resolution of defendant's asserted health-care services lien.

### F. Defendant's Demand Letter to Ginzkey

On February 25, 2015, on behalf of defendant, the law firm of Frederick & Hagle sent Ginzkey a letter "concerning the money that is owed to [Dr. Lawrence Li] by [plaintiff]" (we quote from the letter). The letter notes that plaintiff "signed a financial [agreement] with Dr. Li when she became his patient" and that she promised, therein, to " 'pay collection costs up to 50% of the balance owed to [defendant],' " as well as " 'reasonable attorney fees incurred to effect collection of this account.' " "[I]t is our position," the letter says, "that[,] as of this moment[,] your client is going to be pay[ing] my attorney's fees, and we are going to seek 50% of the balance owed, which is $34,027.40." The letter warns that unless Ginzkey, as the trustee of the settlement proceeds, turns over this balance to defendant, he will be "subject to punitive damages," like the attorney in *Cirrincione v. Johnson*, 184 Ill. 2d 109 (1998). "Dr. Li is entitled to the usual and customary charges for the services that he rendered in this matter," the letter claims. "He does not have to accept health insurance that pays at a drastically reduced price." (In the financial agreement, referenced in this letter, defendant agreed, "as a courtesy," to "assist [plaintiff] in obtaining insurance benefits by filing [c]laims for services when she ha[d] assigned those benefits to [defendant].") The letter concludes with an ultimatum: "We demand that you turn over to Dr[.] Lawrence Li the sum of $34,027.40. If this is not done within 14 days, we shall [file] a suit against your client and against you for unreasonably withholding his money."

### G. The Combined Summary Judgment
### and Determination of Lien

On July 19, 2016, the trial court entered an order, which (1) granted defendant's motion for summary judgment on both counts of the second amended complaint and (2) determined defendant's health-care services lien to be valid.

#### 1. *The Trial Court's Reasoning as to*
#### *Count I, the Theory of Consumer Fraud*

The first count of the second amended complaint set forth a theory of consumer fraud in that defendant:

> "(a) refus[ed] to bill BLUE CROSS for services rendered to plaintiff, despite being contractually obligated to do so;
>
> (b) refus[ed] to accept payment from BLUE CROSS for services rendered to plaintiff, despite being contractually obligated to do so; [and]
>
> (c) fraudulently bill[ed] plaintiff $34,027.40 plus costs and attorney fees when [defendant] was contractually entitled to less than $8,000."

- 4 -

¶ 30    The trial court reasoned that (a), (b), and (c) were merely allegations that defendant had breached a contract, namely, the "Participating Provider Agreement," and that according to such cases as *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100 (2005), and *Golembiewski v. Hallberg Insurance Agency, Inc.*, 262 Ill. App. 3d 1082 (1994), a plaintiff "[had to] establish more than a simple breach of contract" to "prevail on a claim under the [Consumer Fraud and Deceptive Business Practices Act]" (815 ILCS 505/1 *et seq.* (West 2014)).

¶ 31                      2. *The Trial Court's Reasoning as to*
             *Count II, the Theory of Intentional Infliction of Emotional Distress*

¶ 32    Count II of the second amended complaint alleged that defendant had intentionally inflicted emotional distress on plaintiff by (1) sending "invalid lien[s]" to the automobile insurers; (2) refusing to voluntarily provide plaintiff's attorney, James Ginzkey, a copy of the "Participating Provider Agreement;" (3) sending the "threatening letter" to Ginzkey, which he in turn forwarded to plaintiff; and (4) failing to inform the author of the "threatening letter," the law firm of Frederick & Hagle, that there was a "Participating Provider Agreement."

¶ 33    The trial court noted that, according to plaintiff's own allegations, the only adverse "mental conditions" she had suffered as a result of these acts or omissions by defendant were loss of sleep and loss of appetite. The record lacked evidence of " 'distress *** so severe that no reasonable [person] could [have been] expected to endure it.' " *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976) (quoting Restatement (Second) of Torts § 46, cmt. j (1965)). The record also lacked evidence of "extreme and outrageous" conduct. *Id.* at 89.

¶ 34                      3. *The Trial Court's Reasoning as to*
                         *the Petition To Adjudicate the Lien*

¶ 35    In addition to her second amended complaint, plaintiff had filed a petition that the trial court adjudicate defendant's lien to be invalid and nonexistent. See 770 ILCS 23/30 (West 2014) ("On petition filed by the injured person or the health care professional or health care provider and on the petitioner's written notice to all interested adverse parties, the circuit court shall adjudicate the rights of all interested parties and enforce their liens."). In her petition, plaintiff gave two reasons why the lien should be "adjudicated to zero."

¶ 36    The first reason was that by signing the "Participating Provider Agreement," defendant had contractually waived its right to claim any lien or to seek any recovery from plaintiff. The trial court was unconvinced because instead of "seeking payment from either plaintiff or her attorney as her agent," defendant was "making a claim against a fund of monies to be paid by a private defendant." In this context, the court cited *Rogalla v. Christie Clinic, P.C.*, 341 Ill. App. 3d 410 (2003).

¶ 37    The second reason that plaintiff gave for the proposed invalidation of the lien was that defendant had failed to comply with section 10(b) of the Health Care Services Lien Act (Lien Act) (770 ILCS 23/10(b) (West 2014)), in that none of the notices had been sent (1) to her, (2) to the responsible driver, or (3) by registered or certified mail. The trial court found "insufficient evidence" of (1), (2), and (3). Besides, such "technical violation[s]" would be insufficient to defeat a health-care services lien, the court concluded.

¶ 38    This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40                                A. Forfeiture of the Theory
                            of Intentional Infliction of Emotional Distress

¶ 41        In her opening brief, plaintiff makes no argument in support of her theory of intentional infliction of emotional distress. Therefore, that theory is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued are [forfeited] ***."); *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010).


¶ 42                        B. Breach of Contract, Dressed Up as Consumer Fraud

¶ 43        We review summary judgments *de novo*, meaning that we perform the same analysis a trial court would perform. *Bowman v. Chicago Park District*, 2014 IL App (1st) 132122, ¶ 43; *City of Mattoon v. Mentzer*, 282 Ill. App. 3d 628, 633 (1996). Section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2014)) provides: "The [requested summary] judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, under section 2-1005(c), the trial court—and therefore we—should ask two questions. First, do the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact? *Id.* Second, if the answer to that question is yes, is the moving party consequently entitled to a judgment as a matter of law? *Id.*

¶ 44        When it comes to count I of the second amended complaint, we see no dispute regarding material facts, nor do we see any possibility that reasonable persons could draw different inferences from the undisputed material facts. See *Chicago Transit Authority v. Clear Channel Outdoor, Inc.*, 366 Ill. App. 3d 315, 323 (2006). The claim of consumer fraud is based on documents, the authenticity of which defendant does not dispute.

¶ 45        We proceed, then, to the second question: given the undisputed material facts, is defendant legally entitled to a judgment on plaintiff's claim of consumer fraud? See 735 ILCS 5/2-1005(c) (West 2014). The answer is yes because the purported consumer fraud is a dressed-up breach of contract. "A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery*, 216 Ill. 2d at 169. "When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract." *Greenberger v. GEICO General Insurance Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (citing *Avery*, 216 Ill. 2d 100). The alleged consumer fraud and the breach of contract cannot "rest on the same factual foundation." *Id.*

¶ 46        The very language of plaintiff's second amended complaint proclaims that the asserted consumer fraud was a breach of contract. Plaintiff alleges that defendant committed consumer fraud by doing the following three things:

        "(a) refusing to bill BLUE CROSS for services rendered to plaintiff, *despite being contractually obligated to do so*;

        (b) refusing to accept payment from BLUE CROSS for services rendered to plaintiff, *despite being contractually obligated to do so*; [and]

        (c) fraudulently billing plaintiff $34,027.40 plus costs and attorney fees when *[defendant] was contractually entitled to less than $8,000*." (Emphases added.)

The contract to which plaintiff refers is the "Participating Provider Agreement." Plaintiff and defendant have a difference of opinion on the interpretation and application of that agreement. "[A] mere difference of opinion regarding contract interpretation" is not consumer fraud. *Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 30. As we soon will explain, it is defendant that has the incorrect opinion as to the meaning and effect of the "Participating Provider Agreement." Even so, "[e]very individual breach of contract between two parties does not amount to a cause of action cognizable under the [Consumer Fraud] Act." *Bankier v. First Federal Savings & Loan Ass'n of Champaign*, 225 Ill. App. 3d 864, 875 (1992).

¶ 47　But this is not a breach of contract "between [the] two parties," plaintiff argues. *Id.* Rather, the contract that defendant breached, the "Participating Provider Agreement," was between defendant and Blue Cross.

¶ 48　Even so, a third party may sue for a breach of contract made for that third party's direct benefit. "[I]f a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct[,] he may sue on the contract; if incidental[,] he has no right of recovery thereon." *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 257 (1931). The appellate court has explained:

> "Whether someone is a third-party beneficiary depends on the intent of the contracting parties, as evidenced by the contract language. [Citation.] It must appear from the language of the contract that the contract was made for the direct, not merely incidental, benefit of the third person. [Citation.] Such an intention must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs. [Citation.]" *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020 (2009).

¶ 49　The "Participating Provider Agreement" contains "an express provision *** identifying the third-party beneficiary *** by description of a class to which the third party belongs." *Id.* Paragraph 7 of article IV—the paragraph stating that defendant shall have no right of recourse against "the Covered Person"—includes the following sentence: "The Covered Persons *** shall be third[-]party beneficiaries of this clause." Plaintiff is a "Covered Person," and, as such, plaintiff is an intended third-party beneficiary of the "Participating Provider Agreement" between defendant and Blue Cross. By suing for consumer fraud—a consumer fraud premised on a breach of that agreement—she really is suing for breach of a contract of which she is an intended third-party beneficiary. Her real theory is breach of contract, and "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery*, 216 Ill. 2d at 169.

¶ 50　　　　　C. The Question of Whether Defendant Has a Valid
Health-Care Services Lien on the Settlement Proceeds

¶ 51　　　　　1. *The Irrelevance of Legislative History*

¶ 52　On February 16, 2012, House Bill 5823 proposed amending the Lien Act so as to provide that "if a health insurance, a health plan, or private or public benefits are available to pay a medical bill, the lien of the health care professional or health care provider shall be limited to the rates established by the private or public fund." 97th Ill. Gen. Assem., House Bill 5823, 2012 Sess. On March 27, 2012, however, House Amendment No. 1 to House Bill 5823 deleted

that quoted language. Defendant reasons: "The legislature made clear[,] in rejecting the relevant language in House Bill 5823[,] that it did not intend to force health care providers to accept the drastically reduced health insurance payments in these cases."

¶ 53    Unless the Lien Act contains an ambiguity, this legislative history is irrelevant. See *Kunkel v. Walton*, 179 Ill. 2d 519, 536 (1997); *Kaider v. Hamos*, 2012 IL App (1st) 111109, ¶ 11; *Bailey v. Illinois Liquor Control Comm'n*, 405 Ill. App. 3d 550, 559-60 (2010). Defendant identifies no such ambiguity. Defendant argues, however, that our citation of a dictionary, later in this opinion, is "evidence of ambiguity" in the Lien Act. We disagree. Courts commonly cite dictionaries to establish that the words of a statute, understood in their plain and commonly accepted sense, are *not* ambiguous. See, *e.g.*, *In re M.I.*, 2016 IL 120232, ¶ 26; *Hocraffer v. Trotter General Contracting, Inc.*, 2013 IL App (3d) 120539, ¶¶ 10, 13; *In re Application for Tax Deed*, 285 Ill. App. 3d 930, 933 (1997).

¶ 54    Reading the Lien Act in its plain and ordinary sense, we see no provision that could reasonably be interpreted as forcing health-care providers to accept health insurance payments as full satisfaction.

¶ 55    Health-care providers, however, could contractually agree to do so.

¶ 56                    2. *How the Present Case Differs From* Rogalla

¶ 57    Reasoning from *Rogalla*, the trial court found no contradiction between defendant's lien and the "Participating Provider Agreement" because, instead of "seeking payment from either Plaintiff or her attorney as her agent," defendant was "making a claim against a fund of monies to be paid by a private defendant." Instead of making a claim directly against plaintiff, defendant made a claim against a debt owed to plaintiff—defendant asserted a lien.

¶ 58    A lien is somewhat different from, say, a personal-injury complaint in that a lien is against property instead of the property owner. See *Rogalla*, 341 Ill. App. 3d at 420. The United States District Court for the Northern District of Illinois has criticized this distinction as a "pure solecism." *Falls v. Silver Cross Hospital & Medical Centers*, No. 13 C 695, 2013 WL 2112188, at *3 (N.D. Ill. May 15, 2013). Admittedly, it might sound artificial and formalistic to say, "I am not making a claim against you; rather, I am making a claim against your bank account." After all, a bank account and a right to insurance proceeds are the same sort of property: a chose in action. *Young v. Chicago Federal Savings & Loan Ass'n*, 180 Ill. App. 3d 280, 285 (1989); *In re Estate of Kane*, 30 Ill. App. 2d 470, 472 (1961); *People ex rel. Vancil Motor Co. v. Weaver*, 313 Ill. App. 317, 320 (1942). Keep in mind, however, why we made this distinction in *Rogalla*: we were reconciling two provisions of a contract.

¶ 59    The contract in *Rogalla* was a medical services agreement between Christie Clinic and PersonalCare Health Management, Inc. (PersonalCare), a health maintenance organization (HMO) of which the plaintiff was a member. *Rogalla*, 341 Ill. App. 3d at 412. On the one hand, the agreement provided that Christie Clinic was not to " 'assert any claim for compensation against Members in excess of the copayments authorized by PersonalCare's HMO.' " *Id.* at 415. On the other hand, the agreement provided: " 'Christie [Clinic] and PersonalCare shall have the right to seek to recover charges incurred as a result of providing Medical/Hospital Services which are the liability of a third party.' " *Id.* at 416. In *Rogalla*, we called this latter provision a "subrogation clause." *Id.* at 414.

¶ 60    Strictly speaking, the term "subrogation clause" was only partly apt. Subrogation arises when the subrogee involuntarily pays a debt on behalf of a third party; having done so, the subrogee becomes entitled to assert the rights of the original creditor. *Dunlap v. Peirce*, 336 Ill. 178, 190 (1929); *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 706 (2000). To the extent that Christie Clinic was contractually "obligated to pay *** third-party health-care providers for services rendered to [the] plaintiff" (*Rogalla*, 341 Ill. App. 3d at 412), Christie Clinic was indeed a subrogee: it stepped into the shoes of the original creditors, the third-party health-care providers. But to the extent that the charges originated from Christie Clinic—to the extent that Christie Clinic itself was the health-care provider—Christie Clinic was not a subrogee. The original creditor cannot be a subrogee; Christie Clinic could not have stepped into the shoes it already had on its feet. Therefore, this time, to avoid any potential confusion, we will call the provision in question a "third-party clause" rather than a "subrogation clause."

¶ 61    We had to find a way to give effect to both of those provisions, if at all possible: both the exemption clause and the third-party clause. See *St. Paul Fire & Marine Insurance Co. v. Frankart*, 69 Ill. 2d 209, 216 (1977). There was a way. A canon of construction taught that if both a general clause and a specific clause of a contract addressed the same subject, full effect was to be given to the more specific clause and the general clause was to be given whatever modification the specific clause made necessary. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 549 (1999). The question of whether Christie Clinic could assert a health-care services lien against the tortfeasor (the driver who had injured the plaintiff in the motor vehicle accident) was more specifically addressed by the third-party clause than by the exemption clause. Thus, the third-party clause, being more specifically relevant, was to be understood as modifying the more general exemption clause. See *Rogalla*, 341 Ill. App. 3d at 417. Outside the context of the medical services agreement in *Rogalla*, it might indeed seem artificial and unconvincing to draw a distinction between collecting from a person and collecting from a chose in action belonging to that person, but drawing that distinction was the only reasonable way to reconcile the two provisions in the agreement.

¶ 62    In this discussion of *Rogalla*, we do not mean to imply that the inclusion of a third-party clause is a precondition of a statutory health-care services lien. See *Barry v. St. Mary's Hospital Decatur*, 2016 IL App (4th) 150961, ¶ 55 ("[T]he absence of such a clause is of no import because even without that clause, the provider still has the right to seek a lien pursuant to the Lien Act."). The only significance of the third-party clause in *Rogalla* is that it qualified the exemption clause—which, unqualified, might have been interpreted as relinquishing the statutory right to a health-care services lien. See *Rogalla*, 341 Ill. App. 3d at 418 ("[T]he [subrogation] clause reserves Christie Clinic's statutory right to seek relief from third-party tortfeasors."). By interpreting the third-party clause as a qualifying provision, *Rogalla* reconciled two contractual provisions that appeared to stand in tension with one another.

¶ 63    There is no occasion to do any such reconciling in the present case, for unlike the medical services agreement in *Rogalla*, the "Participating Provider Agreement" lacks a third-party clause or subrogation clause. So, *Rogalla* is distinguishable for that reason alone.

¶ 64    Another difference is that, unlike the medical services agreement in *Rogalla*, the "Participating Provider Agreement" in this case contains a full-payment clause: "The Contracting Provider agrees to accept the Plan's Usual and Customary Fee allowance as full payment for each service covered by the Plan Insured's Usual and Customary Contract ***."

The full-payment clause is significant because section 10(a) of the Lien Act uses the word "lien" ("Every *** health care provider that renders any service in the treatment *** of an injured person *** shall have a *lien* upon all claims and causes of action of the injured person for the amount of the *** health care provider's reasonable charges up to the date of payment of damages to the injured person." (Emphasis added.) 770 ILCS 23/10(a) (West 2014)). We should give the words of a statute their ordinary meanings (and if a statute specially defines a word, we should give the words of the special definition their ordinary meaning). *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15 (1991). A dictionary is a useful resource in which to find the ordinary meanings of words. *Id.*

¶ 65        The Lien Act does not specially define "lien," and therefore we will give that word its ordinary meaning, which can be found in a dictionary. See *id.* A "lien" is "[a] legal right or interest that a creditor has in another's property, lasting usu[ally] until a debt or duty it secures is satisfied." Black's Law Dictionary 933 (7th ed. 1999). A "creditor" is "[o]ne to whom a debt is owed." *Id.* at 375. Thus, to have a health-care services lien on plaintiff's chose in action (the settlement proceeds), defendant had to be plaintiff's creditor; plaintiff had to owe a debt to defendant for health-care services. The existence of such a debt depended not on the Lien Act but, rather, on the contractual relationship between defendant and plaintiff. Under the "Participating Provider Agreement," of which plaintiff was an intended third-party beneficiary, defendant was not plaintiff's creditor, and defendant had no "reasonable charges" against her, because Blue Cross's payment of its "Usual and Customary Fee allowance" was, as defendant had agreed, "full payment for each [covered] service." Without an unpaid debt owed by plaintiff, there can be no valid lien on her property. See *Barry*, 2016 IL App (4th) 150961, ¶ 66 ("Because there is no longer a debt owed to [the hospital] ***, liens for [it] can no longer be maintained."); *N.C. v. A.W.*, 305 Ill. App. 3d 773, 775 (1999) ("[I]f there is no debt in the first instance, there is no need for a lien."); Black's Law Dictionary 933 (7th ed. 1999). Therefore, in our *de novo* interpretation of the Lien Act and the "Participating Provider Agreement" (see *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12 (1996); *Pennsylvania Life Insurance Co. v. Pavlick*, 265 Ill. App. 3d 526, 529 (1994)), we conclude that the trial court should have granted plaintiff's "Petition To Adjudicate Lien to Zero."

¶ 66        In its petition for rehearing, defendant objects that in reaching this conclusion, we rely on a third-party beneficiary theory that plaintiff never raised, either in the trial court or on appeal, and that, in fact, plaintiff expressly disavows in her brief.

¶ 67        Actually, in so many words, plaintiff did raise a third-party-beneficiary theory in the trial court. Paragraphs 4 and 5 of the second amended complaint allege, for example:

> "4. The ['Participating] Provider Agreement['] has no provision preserving the Provider's [(defendant's)] lien rights, and has no provision that the Agreement is not to be construed so as to create any rights in a third party.
>
> 5. [Defendant] and BLUE CROSS intended that plaintiff, as a 'Covered Person' under the ['Participating] Provider Agreement,['] receive a benefit for the performance of the Agreement."

¶ 68        The gist of those quoted paragraphs is that by agreeing to regard Blue Cross's payment of a covered person's medical bills as payment in full, with no right of recourse against the covered person, defendant and Blue Cross intended covered persons to be third-party beneficiaries of the "Participating Provider Agreement."

¶ 69    We do not understand plaintiff as disavowing that theory on appeal. Defendant, to the contrary, sees such a disavowal in the following excerpts from plaintiff's brief:

> "But plaintiff never alleged that she had a contract with defendant; nor did plaintiff ever allege that defendant breached a contract with plaintiff. The actual allegations of plaintiff's second amended complaint appear to have been utterly ignored ***.
>
> * * *
>
> *** Plaintiff never alleged that she had standing to sue defendant for defendant's breach of the Blue Cross ['Participating] Provider Agreement.['] What plaintiff alleged is that filing invalid liens[,] defendant is defrauding plaintiff."

¶ 70    It is quite true that the "Participating Provider Agreement" is not a contract between plaintiff and defendant; that is why plaintiff is a *third-party* beneficiary. Granted, plaintiff disclaims any allegation of "standing to sue defendant for defendant's breach of the ['Participating Provider Agreement']," but then, paradoxically, in the next sentence, she asserts such standing by arguing that defendant is liable to her for fraud because its health-care lien breaches the "Participating Provider Agreement." Also, elsewhere in her brief, plaintiff argues: "A health care professional waives his statutory lien rights when he signs a Provider Agreement relinquishing all rights of recourse against his insured patient; he also waives his normal billing rate for services by agreeing to accept a lesser amount from the insurer." And later in her brief, plaintiff argues: "[Defendant] and BLUE CROSS intended that plaintiff, as a 'Covered Person' under the ['Participating] Provider Agreement,['] receive a benefit for the performance of the Agreement." Plaintiff argues, in other words, that she is an intended third-party beneficiary of the "Participating Provider Agreement" between defendant and Blue Cross. Thus, we disagree that plaintiff has "waived the issue of whether she has third[-]party beneficiary rights under the ['Participating] Provider Agreement['] between [Blue Cross] and [defendant]."

¶ 71    Besides, we have held that, to contest the reasonableness of a health-care provider's charges, the covered person does not even have to be an intended direct third-party beneficiary of the contract between the provider and the health insurer. In *Barry*, the "Preferred Facility Agreement" explicitly disclaimed any intention to create third-party beneficiaries. *Barry*, 2016 IL App (4th) 150961, ¶¶ 83-84. Even so, we held that the liens for the first two medical bills had lost their validity when the patient's health insurer paid those bills at the discounted rate stipulated in the "Preferred Facility Agreement." *Id.* ¶ 66.

¶ 72    The reason was this: it would have been untenable for a health-care provider to characterize as *unreasonable* a rate to which the provider had contractually agreed. In its contract with the insurer, the provider surely would not have agreed to accept a certain rate as full payment unless the rate were reasonable. Having agreed to accept that rate as full payment, how could the provider reasonably charge the covered person more—apart from the question of whether, under contract law, the covered person may enforce the contract between the provider and the insurer? Section 10(a) of the Lien Act provides: "Every health[-]care professional and health[-]care provider that renders any service in the treatment, care, or maintenance of an injured person *** shall have a lien upon all claims and causes of action of the injured person for the amount of the health[-]care professional's or health[-]care provider's *reasonable* charges ***." (Emphasis added.) 770 ILCS 23/10(a) (West 2014). Thus, the criterion in section 10(a) is reasonableness, not third-party beneficiary status. See *Gekas v. Williamson*, 393 Ill. App. 3d 573, 579 (2009) (we should not "deviate from the plain language

- 11 -

of the statute by reading into it exceptions, limitations, or conditions that have no basis in the text").

¶ 73 "Generally, reasonableness is a question of fact rather than a question of law, unless reasonable minds could not differ." *Brame v. City of North Chicago*, 2011 IL App (2d) 100760, ¶ 13. If covered persons are intended direct third-party beneficiaries of the agreement between the health-care provider and the health insurer, and if the agreement states that a certain rate, to be paid by the insurer, shall be full payment for the covered services, with no right of recourse against the covered person, no reasonable mind would regard a higher rate to be a reasonable charge. Charging a higher rate and recouping the difference from the covered person (we do not refer to copayments and deductibles) would violate the contractual rights of both the insurer and the covered person. If, despite the disclaimer of third-party beneficiaries in *Barry*, pursuing a lien for medical bills that had been paid at the contractually agreed-upon discounted rate would be unreasonable (see *Barry*, 2016 IL App (4th) 150961, ¶ 66), it would be even more unreasonable to do so if the covered persons were intended third-party beneficiaries of the discounted rate.

¶ 74                                3. *Consistency With* Barry

¶ 75 In oral arguments, counsel for plaintiff implied that we could reach this conclusion (that defendant's asserted health-care services lien should be adjudicated as zero, or nonexistent) only by abandoning our decision in *Barry*. He asked, rhetorically, whether it was "possible" that we were "wrong" in *Barry*.

¶ 76 We see no reason to abandon *Barry*. Nor do we see any contradiction between *Barry* and our decision in this case.

¶ 77 In *Barry*, there were three medical bills (*Barry*, 2016 IL App (4th) 150961, ¶ 5), and for each of them, the hospital filed a health-care services lien with the tortfeasor's insurer, State Farm (*id.* ¶¶ 6-11). The hospital conceded, and we agreed, that the liens for the first two medical bills were no longer viable, since, after the hospital filed the liens for those bills, the plaintiff's insurer, Consociate Health Insurance (Consociate), paid those bills at the discounted rate to which the hospital and Consociate had agreed in the "Preferred Facility Agreement." *Id.* ¶ 66. A health-care services lien could be only for "reasonable charges," and it would have been difficult for the hospital to deny the reasonableness of the discounted rate, considering that the hospital had agreed to that rate. 770 ILCS 23/10(a) (West 2014).

¶ 78 Thus, one of the holdings in *Barry* is that once the patient's insurer pays a medical bill at the discounted rate to which the hospital and the insurer contractually agreed, there can be no valid health-care services lien for that bill. *Barry*, 2016 IL App (4th) 150961, ¶ 66. In the present case, Blue Cross paid the medical bills at the discounted rate to which defendant and Blue Cross had agreed. Therefore, under *Barry*, defendant has no valid lien. See *id.* It is true that after cashing the checks from Blue Cross, defendant sent the money back to Blue Cross. Defendant does not explain, however, why this unsolicited refund should make any difference, given that Blue Cross rendered its agreed-upon contractual performance. See *Wasserman v. Autohaus on Edens, Inc.*, 202 Ill. App. 3d 229, 239 (1990) ("A person who pre[v]ents the performance of an alleged condition to a contract cannot take advantage of his conduct to claim that the resulting failure of the condition relieves him of his obligation under the contract.").

¶ 79 Merely for the sake of argument, though, let us assume that by sending the money back to Blue Cross, defendant made itself comparable to a medical provider that never billed the

patient's insurer in the first place. The discussion of the third medical bill in *Barry* then would become relevant. The third medical bill in *Barry* had not been paid because the hospital had not sent it to the plaintiff's insurer, Consociate. *Barry*, 2016 IL App (4th) 150961, ¶¶ 10-11. Instead, for that bill, the hospital immediately filed a lien with the tortfeasor's insurer, State Farm. *Id.* According to the hospital, it was acting on the plaintiff's instructions by doing so. *Id.* ¶ 11. Evidently, the plaintiff disputed he had so instructed the hospital. He sued the hospital for filing a lien with State Farm in lieu of submitting the bill to Consociate. *Id.* ¶ 47. For essentially three reasons, we were unconvinced that the hospital had a duty to submit this third medical bill to Consociate before filing a lien with State Farm.

¶ 80    First, the Lien Act did not say that, to acquire a lien, the medical provider had to first submit the bill to the patient's insurer. *Id.* ¶ 50. We lacked authority to write that requirement into the statute. *Id.* In the present case, we are of the same view. It was not the Lien Act that required defendant to send the bills to Blue Cross and accept payment at the discounted rate. Rather, it was the "Participating Provider Agreement" that required defendant to do so.

¶ 81    Second, in *Barry*, we disagreed with the plaintiff that the "Preferred Facility Agreement" between the hospital and Consociate required the hospital to bill Consociate. *Id.* ¶ 59. Granted, the agreement included a section in which the hospital agreed to bill Consociate within 60 days after furnishing health-care services. *Id.* ¶ 56. Nevertheless, Consociate was the secondary insurer, and State Farm was the primary insurer, and the agreement also included a section entitled " 'Coordination of Benefits.' " The " 'Coordination of Benefits' " section provided that if there was a third-party tortfeasor, the hospital would seek payment from the tortfeasor first and then, if the amount the hospital recovered from the tortfeasor was less than 100% of the discounted rate, the hospital could seek the difference from Consociate. *Id.* ¶¶ 57-58. Besides, the "Preferred Facility Agreement" explicitly disclaimed third-party beneficiaries, and therefore, even if the plaintiff in *Barry* had a sound argument from the language of the contract, it was a contract that he had no right to enforce. *Id.* ¶¶ 83-84. In the present case, by contrast, the "Participating Provider Agreement" between defendant and Blue Cross explicitly states that "Covered Persons," such as plaintiff, are intended third-party beneficiaries, and we do not see any contractual language entitling defendant to seek recovery from a third-party tortfeasor before accepting full payment, at the discounted rate, from Blue Cross. Rather, defendant simply "agree[d] to accept the Plan's Usual and Customary Fee allowance as full payment for each service covered by the Plan."

¶ 82    Third, in *Barry*, we were unpersuaded by the plaintiff's argument that the consent form, which he had signed at the hospital, obligated the hospital to bill Consociate. *Id.* ¶ 60. "[T]he consent form [did] not contain any language requiring [the hospital] to bill a patient's insurance before it [could] pursue a lien." *Id.* In the present case, by contrast, defendant drafted a financial agreement and had plaintiff sign it, and in the financial agreement, defendant promised to "assist [plaintiff] in obtaining insurance benefits by filing [c]laims for services."

¶ 83    In sum, then, we find there is no contradiction between *Barry* and our decision in this case.

¶ 84                        D. The Request for a Certificate of Importance

¶ 85    Defendant requests that, pursuant to Illinois Supreme Court Rule 316 (eff. July 1, 2017), we certify this case for review by the supreme court. This power should be used sparingly. *People v. Cherry Valley Public Library District*, 356 Ill. App. 3d 893, 900 (2005). Although we can see how this case might be important to health-care providers, this case seems to us,

- 13 -

basically, to be simple and straightforward: to have a health-care services lien against plaintiff's settlement proceeds, defendant had to be plaintiff's creditor, and under the "Participating Provider Agreement," plaintiff owed defendant nothing after Blue Cross made the payments agreed upon therein. Because this case, as far as we can see, raises no exceptionally difficult question, we think it best that defendant proceed through the usual channels by petitioning the supreme court for leave to appeal. See Ill. S. Ct. R. 315 (eff. July 1, 2017); *Cherry Valley Library District*, 356 Ill. App. 3d at 900. The supreme court is in a better position than we to decide whether it should accept this case for further review. See *John Crane, Inc. v. Admiral Insurance Co.*, 2013 IL App (1st) 1093240-B, ¶ 73. Therefore, we deny the request for a certificate of importance. See Ill. S. Ct. R. 316 (eff. July 1, 2017).

¶ 86                                    III. CONCLUSION

¶ 87     For the foregoing reasons, we affirm the trial court's judgment in part and reverse it in part: we affirm the summary judgment in defendant's favor on counts I and II of the second amended complaint, but we reverse the denial of plaintiff's petition to invalidate defendant's asserted health-care services lien.

¶ 88     Affirmed in part and reversed in part.