2026 IL App (1st) 241448-U

No. 1-24-1448

First Division
March 30, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| TAMIKO DeJESUS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 L 006279 |
| TERESA TAM, M.D., | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Bridget J. Hughes |
| | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment is affirmed where the court did not err in overruling plaintiff's Rule 213 objection, submitting a special interrogatory to the jury, or granting two of defendant's motions *in limine*.

¶ 2    This appeal arises from a medical malpractice lawsuit filed by plaintiff-appellant Tamiko DeJesus against defendant-appellee Dr. Teresa Tam. Plaintiff alleged that she suffered nerve damage in both legs due to defendant's negligence during a robot-assisted laparoscopic myomectomy in August 2018. Following a trial in 2024, the jury entered a verdict in favor of

defendant. The jury also answered a special interrogatory asking, "Did [defendant] act as a reasonably careful gynecologist in her care of [plaintiff]?" in the affirmative. Plaintiff now appeals, arguing that the trial court erred by (1) allowing defendant to testify to a previously undisclosed opinion in violation of Illinois Supreme Court Rule 213(g) (eff. Jan 1, 2018), (2) submitting the special interrogatory to the jury, and (3) granting two of defendant's motions *in limine* to exclude certain evidence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In 2018, plaintiff, who was then 42 years old, visited her primary care physician with complaints of heavy menstrual bleeding due to the presence of fibroids on her uterus. The primary care physician referred plaintiff to a gynecologist, who suggested a hysterectomy to remove plaintiff's ovaries, fallopian tubes, and uterus. Plaintiff then sought a second opinion and was referred to defendant in June 2018.

¶ 5     After meeting with defendant, plaintiff decided to undergo a robot-assisted laparoscopic myomectomy instead. The myomectomy was to be a minimally invasive procedure to remove the fibroids while leaving the uterus and other structures intact. Plaintiff testified that a laparoscopic myectomy was "the best thing for [her]" because it required less recovery than a hysterectomy and would allow her to "get back to a normal life" much faster.

¶ 6     Defendant ultimately performed the surgery on August 30, 2018. Upon waking up from anesthesia, plaintiff began reporting pain and numbness in both legs, which she now alleges was caused by nerve damage incurred during the lengthy procedure. Plaintiff's right leg eventually returned to normal with only "occasional" shooting pains. However, plaintiff continued to suffer from tingling, numbness, and burning pain in her left leg.

¶ 7                                A. Plaintiff's Complaint

¶ 8      Plaintiff filed her initial complaint in this matter on June 11, 2020, naming several defendants. Plaintiff subsequently filed a first amended complaint on September 2, 2020, which is the operative complaint for this appeal. The amended complaint raised one count of medical negligence and one count of negligence under the theory of *res ipsa loquitur* against defendant. The medical negligence count alleged that defendant was negligent in various ways. However, most salient to this appeal is the allegation that defendant failed to properly position plaintiff so as to avoid a nerve compression injury during the lengthy myomectomy, which lasted between six and seven hours. Similarly, the *res ipsa* count alleged that, while plaintiff was in the exclusive control of defendant, she suffered a nerve compression injury that would not have occurred absent defendant's negligence in positioning her for the surgery.

¶ 9                                        B. Pretrial Motions

¶ 10     Prior to trial, the trial court considered numerous motions *in limine* from both parties. Of particular relevance to this appeal are defendant's motions #18 and 22 (MIL #18 and MIL #22).

¶ 11     MIL #18 sought to bar testimony from plaintiff's expert witness that defendant deviated from the standard of care by failing to take notes on plaintiff's post-operative care. Defendant argued that this testimony should be excluded because plaintiff's expert could not make a causal connection between the lack of post-operative notes and plaintiff's injury. At the hearing on the motion, plaintiff's counsel agreed that "[t]he injury ha[d] already occurred" by the time the surgery had finished and could not articulate how documenting the post-operative care could have contributed to or exacerbated plaintiff's injury. The court granted defendant's motion, ruling that the testimony should be excluded absent a showing of causation or "some other purpose" such as impeaching one of the defense's witnesses.

¶ 12     MIL # 22 asked the trial court to bar testimony that plaintiff's surgery did not begin until approximately 3:16 p.m. despite originally being scheduled for the morning. Defendant argued that the start time was irrelevant where no witness testified that it breached the standard of care or contributed to plaintiff's injury. Plaintiff disagreed, contending that the delayed start time was circumstantial evidence relevant to whether defendant was "rushed" or "tired" while performing the surgery. The trial court granted defendant's motion, stating that, "You cannot ask a jury on a medical malpractice case to speculate that that caused or contributed to [plaintiff's] injury without medical testimony."

¶ 13                                    C. Jury Trial

¶ 14     The case proceeded to a jury trial, where the following evidence was adduced.

¶ 15                              1. Plaintiff's Case-in-Chief

¶ 16     Plaintiff testified that she first saw defendant in June 2018 while seeking a second opinion to treat her abnormally heavy menstrual bleeding. Defendant discussed various treatment options with plaintiff and provided her literature, including a pamphlet for a robot-assisted myomectomy. Plaintiff opted for a myomectomy over a hysterectomy because a myomectomy would allow her to keep her uterus and recover more quickly. A pre-operative MRI revealed 22 fibroids that would be surgically removed.

¶ 17     On the day of the surgery, August 30, 2018, plaintiff was driven to the hospital by her ex-husband. Plaintiff did not have any issues with her lower extremities before the surgery and enjoyed many physical activities such as basketball, volleyball, and cycling. In fact, plaintiff had to run through the hospital because she arrived late for the scheduled start time. Plaintiff met with defendant before the operation but did not recall exactly what they discussed.

¶ 18    After the surgery, plaintiff awoke from anesthesia sometime after midnight in "excruciating pain" with numbness, tingling, and burning in her legs. Later that morning, plaintiff was still in pain and unable to walk. She spoke with defendant and was admitted to the hospital, where she stayed for five more days. Plaintiff underwent a series of tests at the hospital, all of which yielded normal results.

¶ 19    Plaintiff was then transferred to a rehab facility where she underwent physical therapy to regain the ability to walk. Plaintiff saw improvement in her right leg during this time but still needed assistance with basic tasks such as getting dressed and using the restroom. She was discharged from the rehab facility after six days, at which point she stayed with her ex-husband so that he could help her with everyday tasks. Plaintiff stayed with her ex-husband for about a week before returning to her own home.

¶ 20    Plaintiff next saw defendant on September 15, 2018. At that time, plaintiff was able to walk and drive, but was still experiencing numbness and pain in her left leg and foot. Plaintiff reported her symptoms to defendant, but defendant did not know what was causing the pain. Defendant referred plaintiff to physical therapy and a sports medicine neurologist. Plaintiff saw defendant for a final time on September 19, 2018, to check that her incision was healing properly.

¶ 21    In October 2018, plaintiff underwent an electromyography (EMG) to test for nerve damage. The results of the EMG were "abnormal" and "showed nerve damage." Plaintiff returned to physical therapy in early 2019. Plaintiff then underwent a second EMG in December 2019, which again showed nerve damage.

¶ 22    Plaintiff testified that, as of the time of trial, she was able to walk, drive, and work as a preschool teacher with light modifications. However, she still experienced "occasional" shooting pains in her right leg and consistent pain, numbness, and tingling in her left leg. She could no

longer participate in physical activities like cycling and basketball. In total, plaintiff incurred $74, 985.52 in medical bills as a result of the myomectomy and its complications.

¶ 23    Plaintiff's gynecological expert, Dr. Shanti Mohling, testified that the patient is typically placed in the Trendelenburg position during a myomectomy, meaning that the patient lays flat on her back with her legs in Yellofin stirrups. The patient is then tilted about 20 degrees to allow better access to the vagina. The patient's hips are slightly flexed, and the knees are flexed about 90 degrees. The table is covered in a sticky gel padding to prevent the patient from sliding on the table during the procedure. Dr. Mohling explained that it is important to position the patient properly to ensure that she does not suffer sustained pressure on the nerves that may result in a nerve compression injury. Dr. Mohling also opined that, as the surgeon, defendant was ultimately responsible for the patient's positioning throughout the operation.

¶ 24    Based on her review of the materials in this case, including the results of plaintiff's EMGs, Dr. Mohling testified that plaintiff suffered a nerve compression injury sometime during her surgery. Dr. Mohling also testified that this injury would not have occurred absent defendant's negligence in positioning plaintiff. Dr. Mohling further opined that defendant violated the standard of care by failing to monitor plaintiff's positioning because no surgical notes documented that the positioning was checked during the procedure. However, Dr. Mohling conceded on cross-examination that defendant's operative report described using positioning techniques and protective equipment that were consistent with the standard of care. Dr. Mohling also testified on cross-examination that defendant could comply with the standard of care by periodically asking a nurse or other medical professional in the operating room to confirm that the patient was still positioned properly.

¶ 25 Dr. William Davison also testified as plaintiff's neurologist. Based on his review of the relevant materials, Dr. Davison concluded that plaintiff suffered compression injuries to the sciatic nerve in both of her legs. Dr. Davison explained that such an injury can occur if a patient is not properly positioned for a lengthy surgery. Because symptoms had persisted for several years, Dr. Davison opined that the injury to plaintiff's left leg was "permanent," meaning she would more than likely experience her symptoms for the rest of her life.

¶ 26                                    2. Defendant's Case-in-Chief

¶ 27 For the defense, defendant testified consistently with plaintiff's account of the events leading up to the surgery. Although defendant did not have any specific recollection of this particular case, she stated it was her custom and practice to inform her patients of the potential risks and complications of any procedure, including the known risk of a nerve compression injury. Defendant's notes from the final pre-operative consultation on August 15, 2018, reflect that she "[d]iscussed surgery risks, indications, and alternatives with patient." Additionally, "[a]ll [plaintiff's] questions were addressed" and plaintiff was given literature about her surgical options. Defendant reviewed this information with plaintiff again on the day of the surgery and obtained her written informed consent to perform the robot-assisted laparoscopic myomectomy.

¶ 28 With respect to positioning, defendant explained that the patient starts in the lithotomy position, laying supine on the table with legs in stirrups and knees flexed approximately 90 degrees. Once the patient is fully prepared, she is then tilted into the Trendelenburg position, where she stays for the majority of the surgery. The patient has padding on her legs and arms as well as a gel padding on the table to prevent sliding. Defendant's operative report reflects that all the typical padding and safety equipment was used during plaintiff's surgery. Defendant testified to a reasonable degree of medical certainty that plaintiff was positioned correctly for the operation.

¶ 29    Defendant further testified that she is primarily responsible for positioning, although she receives assistance from nurses, residents, and surgical technicians in the operating room. Defendant stated that her custom was to occasionally "ask everyone in the room" to check on a patient's positioning. Defendant would also step out of the robotic control console to personally check the patient's positioning "every few hours."

¶ 30    Defendant visited plaintiff on the morning after the surgery, at which point plaintiff was reporting pain and numbness in her legs. Defendant ordered a Doppler scan to check for blood clots, which came back negative. Defendant subsequently ordered a neurological consultation.[1] Plaintiff was ultimately discharged from the hospital several days later. A physical examination performed by a resident on the day of discharge indicated that the strength, sensation, and range of motion in plaintiff's lower extremities was normal.

¶ 31    Defendant next saw plaintiff on September 15, 2018. Plaintiff was able to drive and walk normally, but still complained of pain and numbness in her left leg. Defendant signed a "return to work" form at plaintiff's request. Defendant saw plaintiff for the final time four days later, on September 19, 2018. Plaintiff again complained of left leg numbness on that date. Defendant referred plaintiff to physical therapy and never treated her again.

¶ 32    Defendant further testified that she did not know what caused plaintiff's leg problems. However, defendant acknowledged that nerve compression injuries are a known complication of most surgeries. Defendant explained that the positioning protocols described in her testimony are designed to lessen the risk of a compression injury. Over plaintiff's Rule 213 objection, defendant

---

[1] The record suggests that the neurological consult was performed by Dr. Abdul Jalil, whose testimony was presented via evidence deposition. However, Dr. Jalil's deposition does not appear in the record on appeal.

testified that "proper positioning could mitigate" the risk of a nerve injury, but that an injury could still occur even if the patient is positioned correctly. When questioned on this point during cross-examination, defendant reiterated that proper positioning can "mitigate" the risk of a nerve injury, but cannot eliminate it entirely.

¶ 33    Dr. Rishi Garg, defendant's neurology expert, opined that plaintiff's post-operative symptoms were not consistent with a sciatic nerve injury. Dr. Garg reasoned that sciatic nerve injuries are rare, and that none of the three neurologists who treated plaintiff following her surgery diagnosed a sciatic nerve injury. In particular, Dr. Garg noted that Dr. Jalil, the first neurologist to examine plaintiff after the surgery, found that plaintiff's sensory examination was normal and that her muscle strength was limited only by pain. Dr. Garg testified that this finding "doesn't make sense" if plaintiff had just suffered a significant sciatic nerve injury. Dr. Garg also noted that other treatment providers did not diagnose plaintiff with a sciatic nerve injury even when they were aware of the EMG results. Accordingly, Dr. Garg concluded to a reasonable degree of medical certainty that plaintiff did not suffer a sciatic nerve injury during her myomectomy.

¶ 34    Dr. Julie Dohr also testified as defendant's gynecological expert. Dr. Dohr opined that defendant's deposition established that she complied with the standard of care in informing plaintiff of the potential risks and complications of the surgery, including the risk of a nerve compression injury. Dr. Dohr further stated that the operative report showed that defendant positioned plaintiff properly and used the correct protective equipment to reduce plaintiff's risk of injury. Dr. Dohr agreed that plaintiff likely suffered a nerve injury, but maintained that the injury was not due to defendant's negligence because defendant "positioned the patient correctly and followed exactly what [*sic*] the surgical technique that she was supposed to use for this case." Dr.

Dohr also testified that defendant complied with the standard of care in addressing plaintiff's post-operative complaints of leg pain and numbness.

¶ 35                                    D. Instructions Conference

¶ 36    The initial jury instructions conference began immediately upon the close of evidence on the afternoon of April 23, 2024. Over the defense's objection, the trial court ruled that it would instruct the jury on the theory of *res ipsa loquitur*. Ultimately, the court instructed the jury, in accordance with Illinois Pattern Jury Instruction, Civil, No. 105.09, that plaintiff could prevail under a theory of *res ipsa loquitur* only if she proved in part "in the normal course of events, this injury would not have occurred if the defendant had used a reasonable standard of professional care during the robotic laparoscopic myomectomy while under the control of [defendant]."

¶ 37    During the April 23 conference, the defense also tendered a proposed special interrogatory asking, "Did [defendant] act as a reasonably careful gynecological surgeon when she positioned [plaintiff] for surgery on August 30, 2018?" The trial court refused to give this special interrogatory, reasoning that it would not test the verdict because the jury could find that defendant was negligent in some way other than in positioning plaintiff for surgery. The court instructed defense counsel to broaden the proposed special interrogatory and propose a revised version the next day that "mirror[ed] the language in the *res ipsa*" instruction.

¶ 38    Defense counsel orally proposed revising the special interrogatory to, "[D]id [defendant] use reasonable standard professional care during the robotic assisted laparoscopic myomectomy," which counsel argued better tracked the language in the IPI *res ipsa* instruction. Plaintiff objected, contending that a special interrogatory "has to [concern] some issue that the jury is not directly dealing with." The court stated that it was receptive to giving the proposed special interrogatory but invited plaintiff's counsel to submit additional authority on the matter.

¶ 39 Shortly thereafter, at 4:07 pm, defendant's counsel emailed plaintiff's counsel a revised proposal for the special interrogatory. Plaintiff's counsel responded that she would still object to the proposal because it was "vague and too general." Plaintiff's counsel maintained that "just saying [defendant] was a reasonabl[y] careful gynecologist doesn't mean she didn't deviate from the standard of care in various ways."

¶ 40 The next day, April 24, 2024, the defense tendered a proposed special interrogatory that read, "Did [defendant] act as a reasonably careful gynecologist in her care of [plaintiff]?" Defense counsel argued that this proposal tested the general verdict because, under either of plaintiff's theories of negligence, the jury was required to find that defendant deviated from the standard of care in order to return a verdict for plaintiff. Plaintiff's counsel objected, contending that the proposal was "a general statement" that would not test the verdict because it did not ask whether defendant deviated from the standard of care in specific ways. According to plaintiff, the jury could answer the proposal in the affirmative so long as they thought that defendant was generally a "good doctor" irrespective of any mistakes she might have made in this case.

¶ 41 The trial court agreed to submit defendant's special interrogatory to the jury. In so ruling, the court stated that the jury could return a verdict for plaintiff without being unanimous as to whether plaintiff proved the direct negligence count or the *res ipsa* count. However, under either theory, a jury could not return a verdict for the plaintiff unless it unanimously agreed that defendant was negligent in some way, *i.e.* not a reasonably careful gynecologist in this case. The court further explained that the special interrogatory would be unnecessary if plaintiff was asserting only one theory of negligence. However, plaintiff's counsel affirmed that she still wished to proceed with both theories.

¶ 42 E. Verdict and Posttrial Motion

¶ 43    After closing arguments and deliberation, the jury returned a verdict for defendant. Consistent with that verdict, the jury also answered the special interrogatory in the affirmative.

¶ 44    On May 23, 2024, plaintiff filed a motion for a new trial arguing, among other things, that the trial court erred by (1) allowing defendant to give a "new previously undisclosed opinion" that a nerve injury can occur without negligence; (2) limiting the circumstantial evidence plaintiff could present, particularly that the surgery began much later than originally scheduled; and (3) submitting the special interrogatory to the jury. In particular, plaintiff argued that the special interrogatory "purposefully confused the jury" by shifting the focus away from the specific acts of negligence alleged in the complaint. Plaintiff also maintained that she was given "almost no time to object" to the special interrogatory, and that the court improperly "attempted to bargain" with her by offering to refuse the special interrogatory if she withdrew the *res ipsa* count.

¶ 45    The court held a hearing on plaintiff's motion on June 24, 2024. The record shows that the hearing became somewhat contentious between plaintiff's counsel and the trial court. For example, when plaintiff's counsel claimed that she did not have sufficient time to argue against the special interrogatory, the court interjected to correct what it deemed "a compete mischaracterization of what happened in the case." The court opined that plaintiff was made aware of the special interrogatory at the initial instructions conference and therefore had plenty of time to prepare. Plaintiff's counsel "disagree[d]," arguing that the defense should have tendered its proposals during trial. The court rejected this argument, stating that it was "normal custom and practice" to present special interrogatories at the close of evidence, and that plaintiff was "not caught by surprise" in this case.

¶ 46    Similarly, the trial court took issue with plaintiff's assertion that the court attempted to "barter" or "negotiate" to avoid giving the *res ipsa* instruction. The court stated that plaintiff's

counsel's characterization of the record was incorrect and "borders on unprofessional conduct." The court maintained that it "in no way was bartering or negotiating," but was rather "explaining [its] rationale for giving" the special interrogatory. Ultimately, the court denied plaintiff's motion for a new trial. This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, plaintiff raises virtually identical arguments to those raised in her motion for a new trial, namely that the trial court erred in (1) allowing defendant to testify that a nerve injury can occur during a myomectomy in the absence of negligence, (2) submitting the special interrogatory to the jury, and (3) barring plaintiff from presenting "circumstantial evidence" regarding the surgery start time and defendant's post-operative care.

¶ 49                                  A. Incomplete Record

¶ 50    Initially, however, we note that defendant contends we should summarily affirm the judgment below because plaintiff has failed to provide a complete record on appeal. Specifically, defendant points out that the record does not contain the deposition testimony of Dr. Jalil, Nurse Grace Switaj, and several of plaintiff's medical records that were admitted into evidence as trial exhibits. Plaintiff replies that the missing documents are not relevant to the issues on appeal and are therefore unnecessary for us to resolve the matters raised in her briefs.

¶ 51    It is the appellant's duty to provide a sufficiently complete record to support their claims of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Without a complete record, the reviewing court will typically presume that the judgment below conformed to proper legal principles and was supported by an adequate factual basis. *Beck v. DayOne Pact*, 2023 IL App (1st) 221120, ¶ 29. In such a case, the reviewing court may either dismiss the appeal or summarily affirm the judgement below. *In re Estate of Aryeh*, 2021 IL App (1st) 192418, ¶ 27. However, an

incomplete record does not automatically warrant dismissal or summary affirmance where the issues raised on appeal can be resolved on the record as it stands. *Id.*

¶ 52 In this case, we agree with plaintiff that she has supplied an adequate record from which to resolve her claims of error. It is clear that the missing documents are only tangentially relevant to the issues raised in this case, and neither party relies on this evidence to support its arguments on appeal. Hence, we will consider plaintiff's arguments on the merits.

¶ 53 B. Defendant's Rule 213(g) Disclosures

¶ 54 We first address plaintiff's argument that the trial court erroneously allowed defendant to testify to a previously undisclosed opinion in violation of Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2018). Rule 213(g) provides in relevant part that:

> "The information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial. Information disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition. Except upon a showing of good cause, information in an evidence deposition not previously disclosed in a Rule 213(f) interrogatory answer or in a discovery deposition shall not be admissible upon objection at trial."

The purpose of Rule 213(g) is to avoid unfair surprise and tactical gamesmanship in the disclosure of witnesses' opinions. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 111 (2004). Rule 213 disclosures are mandatory and require strict compliance. *Id.* However, an opinion witness may expand upon a disclosed opinion at trial if that trial testimony states a logical corollary to the disclosed opinion, rather than a new basis for the opinion. *Morrisroe v. Pantano*, 2016 IL App

(1st) 143605, ¶ 37. Stated another way, the witness's trial testimony "must be encompassed by the original opinion." *Id.* The admission of evidence pursuant to Rule 213 is within the trial court's discretion, and the court's ruling will not be reversed on appeal absent an abuse of that discretion. *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009). An abuse of discretion occurs when no reasonable person would agree with the trial court's decision. *Id.*

¶ 55     In this case, the trial court allowed defendant to testify, over plaintiff's Rule 213 objection, that her protocols in positioning a patient for surgery are designed to "help mitigate or reduce a known risk" of neurological injury, but that such an injury can still occur "even when a patient is properly positioned for a lengthy procedure[.]" Plaintiff argues that this opinion was not previously disclosed, and is in fact directly contrary to defendant's discovery deposition. Specifically, plaintiff points to the following excerpt from defendant's deposition, which plaintiff's counsel read into evidence during plaintiff's case-in-chief:

> "Q. Are you aware of known neurological injuries that can occur related to the lithotomy positioning?
> A. Yes.
> Q. Are you aware that surgeries lasting over 180 minutes put patients at risk for neurological injury?
> [DEFENSE COUNSEL]: Objection to the form of that.
> [DEFENDANT]: If they're properly positioned, then there should not be any complications.
> BY [PLAINTIFF'S COUNSEL]:
> Q. So you're telling me that one of the risk factors for neurological injury for lithotomy positioning is not procedures extending over 180 minutes?
> [DEFENSE COUNSEL]: Objection. That mischaracterizes her testimony.
> Go ahead. You can answer it.
> [DEFENDANT]: Again, if the patient is properly positioned, it's not just the time spent on the surgery but really improper positioning that could be a problem. But if she is properly placed, then that should not—should mitigate that risk."

¶ 56     We find that the trial court did not abuse its discretion in admitting defendant's opinion. As previously stated, Rule 213(g) allows a witness to testify to a logical corollary of a disclosed

opinion. A "corollary" is defined as either "an immediate consequence or easily drawn conclusion" or "a natural consequence or result." https://www.dictionary.com/browse/corollary (last visited March 18, 2026); see also *Rivas v. Benny's Prime Chophouse,* 2023 IL App (1st) 221901-U, ¶ 40. Defendant's discovery deposition established that (1) neurological injury is a known risk of lengthy surgeries and (2) proper positioning is designed to *mitigate* that risk. It is a natural and easily drawn conclusion to understand that the risk of a nerve injury is *mitigated* by proper positioning but not completely eradicated.

¶ 57    Plaintiff's argument that defendant's deposition contradicted her trial testimony essentially conflates "mitigate" with another term such as "eliminate." However, they are different words with different definitions. Most relevant to the context of this case, "mitigate" means "to make less severe" or "to reduce the risk or impact of harmful conditions or events" (https://dictionary.com/browse/mitigate (last visited March 18, 2026)), whereas "eliminate" means "to remove or get rid of, especially as being in some way undesirable" (https://dictionary.com/browse/eliminate (last visited March 18, 2026)). By its nature, "mitigate" implies that some risk remains. Thus, it was reasonable for the trial court to conclude that defendant had disclosed that, although proper positioning could *reduce* the risk of a nerve injury, an injury remained *possible* even absent negligence. Accordingly, we cannot say that the trial court abused its discretion in overruling plaintiff's Rule 213 objection.

¶ 58                                    C. Special Interrogatory

¶ 59    Plaintiff next argues that the trial court erred in submitting the special interrogatory to the jury. Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2024)), which provides:

"§2-1108. Verdict—Special Interrogatories. Unless the nature of the case requires otherwise, the jury shall render a general verdict. Within the discretion of the court, the jury may be asked to find specially upon any material question or questions of fact submitted to the jury in writing. Any party may request special interrogatories. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal to determine whether the court abused its discretion."

¶ 60    The purpose of a special interrogatory is to test the general verdict against the jury's special finding on an ultimate issue of fact. *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). A special interrogatory must be a single, direct question that is dispositive of an issue in the case such that the answer may control the verdict. *Givens v. City of Chicago*, 2023 IL 127837, ¶ 70. A special interrogatory is in proper form where (1) it relates to an ultimate issue of fact upon which the parties' rights depend and (2) an answer responsive thereto is inconsistent with a general verdict that might be returned. *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶ 35. Under the relevant version of the special interrogatory statute, the trial court's decision to submit a special interrogatory to the jury "may be reviewed on appeal to determine whether the trial court abused its discretion." 735 ILCS 5/2-1108 (West 2024).

¶ 61    As stated above, the jury answered "Yes" to the special interrogatory, "Did [defendant] act as a reasonably careful gynecologist in her care of [plaintiff]?" Plaintiff contends that this special interrogatory was improper because it did not ask about an ultimate issue of fact that could test the jury's verdict. Indeed, plaintiff maintains that whether defendant acted as a reasonably careful gynecologist is "not a [question of] fact at all." Plaintiff also argues that the special interrogatory was too general to test the verdict because it encompassed care outside of specific allegations of

negligence. In that vein, plaintiff submits that the "general" special interrogatory "undoubtedly confused" the jury about what she was required to prove and allowed the jury to return a defense verdict if it thought that defendant was overall a good doctor.

¶ 62    We disagree. First, whether defendant acted as a reasonably careful gynecologist is clearly a question of fact for the jury to decide. In a professional negligence case, the standard of care required of a defendant is to act as an ordinarily careful professional in the relevant field. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 295 (2000). "The question of whether a medical professional deviated from the standard of care is a question of fact for the jury." *Hardy v. Cordero*, 399 Ill. App. 3d 1126, 1131 (2010).

¶ 63    Moreover, an answer to whether defendant met the standard of care was also dispositive of the rights of the parties, and potentially inconsistent with a general verdict. A general verdict and special interrogatory are inconsistent where the special finding is "absolutely irreconcilable" with the verdict. *Price v. City of Chicago*, 2018 IL App (1st) 161599, ¶ 24. Here, the jury could not possibly have returned a verdict for the plaintiff if it had found that defendant met the standard of care, *i.e.*, that defendant acted as an ordinarily careful gynecologist in treating plaintiff. In that way, the special interrogatory served as a check on the general verdict.

¶ 64    We also find plaintiff's contention that the jury was confused by the wording of the special interrogatory unpersuasive. Notably, plaintiff offers no more than speculation to support this argument. Albeit under a previous version of the special interrogatory statute, courts have declined to speculate that the jury was confused even where the special finding was inconsistent with the general verdict. See, *e.g.*, *Simmons*, 198 Ill. 2d at 563-64 (2002). Conversely, the fact that the special finding and the general verdict were in harmony is some evidence that the jury was not

confused in this case. We fail to see how the single, straightforward question posed in the special interrogatory could have confused the jury.

¶ 65    In any case, plaintiff makes no argument that the trial court's jury instructions were improper. Nor could she, as the instructions closely followed the IPI instructions and explicitly laid out what plaintiff was required to prove on each count. See *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 71-73 (finding no possibility of juror confusion or prejudice to the plaintiff where the special finding was consistent with the verdict and the jury was properly instructed on the law). Under these circumstances, we find that the special interrogatory was in proper form, and that no reversible error occurred.

¶ 66    As a final point on this issue, we note that plaintiff's appellate counsel, who was also her trial counsel, alleges that the trial court "rushed" arguments on the special interrogatory and "bartered" with plaintiff by offering to refuse the special interrogatory in exchange for plaintiff dropping the *res ipsa* count. Plaintiff asserts that the record is "clear" that the trial judge did so because she felt uncomfortable giving the *res ipsa* instruction and was "looking for a way to counteract" that theory.

¶ 67    We first make clear that, regardless of the trial court's rationale, we may affirm the judgment below on any basis appearing in the record. *Kaider v. Jamos*, 2012 IL App (1st) 111109, ¶ 9. For the reasons just explained, the submission of the special interrogatory was not reversible error. Second, our review of the record undermines plaintiff's claims.

¶ 68    Under the Code of Civil Procedure, "[s]pecial interrogatories are to be tendered *** as in the case of instructions." 735 ILCS 5/2-1108 (West 2024). Unless a court order or local rule says differently, jury instructions may be tendered at the close of evidence. *Id.* § 2-1107(c). Here, the defense tendered a proposed special interrogatory at the initial instructions conference, which

occurred immediately after the close of evidence on April 23, 2024. Perhaps defendant *could* have tendered the proposed special interrogatories sooner, but she was under no obligation to do so. We also note that plaintiff's objection to giving a special interrogatory was heard on both April 23 and April 24, 2024. Although neither hearing was particularly extensive, the record shows that the trial judge heard and considered plaintiff's arguments. These arguments were similar to the ones she raises on appeal. In any event, plaintiff had ample time to challenge the special interrogatory in her motion for a new trial, which was not filed until a month after the instructions conference.

¶ 69    We similarly find no merit to plaintiff's assertion that the trial court attempted to "barter" or "negotiate" by offering to refuse the special interrogatory if plaintiff withdrew the *res ipsa* count. Presumably, if the trial court did not want to allow a *res ipsa* instruction, it would have simply refused to do so. However, the court reserved ruling on the *res ipsa* instruction until the end of trial and ultimately gave the instruction over defendant's objection. Although the court did later state that it would refuse the special interrogatory if plaintiff withdrew the *res ipsa* count, the record shows that, in context, the court was merely explaining why the special interrogatory was appropriate only if plaintiff pursued both professional negligence and *res ipsa*. As the trial judge clarified for the record, "I was explaining to you my rationale for giving [the special interrogatory], and then if you wanted to dismiss one of your counts, there would be no need for it." Without expressing an opinion on the court's legal rationale—an issue not before us—we agree with the court's characterization of the record. Accordingly, we find no error here.

¶ 70                              C. Motions *in Limine*

¶ 71    Lastly, plaintiff argues that the court erroneously granted (1) MIL #18, which concerned Dr. Mohling's opinion that defendant deviated from the standard of care by failing to document her post-operative care of plaintiff, and (2) MIL #22, which sought to exclude evidence that the

surgery did not begin until approximately 3:16 pm instead of the morning as originally scheduled. As both parties acknowledge, a trial court's ruling on a motion *in limine* will not be reversed on appeal absent an abuse of the court's discretion. *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 66. Again, a trial court abuses its discretion only where no reasonable person would agree with the court's decision. *Id.*

¶ 72    Before proceeding to the merits, we briefly address defendant's argument that plaintiff has forfeited this issue by failing to make an offer of proof in the trial court and by failing to support her argument with any caselaw in her briefs on appeal. It is true that an offer of proof is generally required to preserve the granting of a motion to exclude evidence for appellate review. *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 50. The offer of proof requirement ensures that the trial court, the opposing party, and the reviewing court are aware of what evidence the party sought to introduce. *Id.* However, this forfeiture rule may be relaxed where the relevant stakeholders understood the nature of the evidence at issue. *Guski v. Raja*, 409 Ill. App. 3d 686, 695 (2011).

¶ 73    Similarly, Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." The purpose of this rule is to require the parties to present sufficiently clear arguments for the reviewing court to properly ascertain and resolve the issues at hand. *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292 (1991).

¶ 74    In this case, plaintiff did not make a formal offer of proof or cite any legal authority to support her claim regarding the motions *in limine*. Indeed, the only citation to authority cited in plaintiff's brief on this issue is a single case that she claimed showed that the standard of review is *de novo*—a proposition she recognizes was mistaken in her reply brief. "Citations to authority

that set forth only general propositions of the law and do not address the issues presented do not constitute relevant authority for purposes of Rule 341(h)(7).” *Robinson v. Point One Toyota, Evanston*, 2012 IL App (1st) 111889, ¶ 54. Even so, the arguments raised are simple and straightforward, and the record shows that all involved understood the issues in the trial court. Because the lack of an offer of proof and citation to legal authority does not impede our review, we will address the merits of plaintiff's arguments.

¶ 75    Turning to the merits, plaintiff contends that she should have been allowed to introduce the excluded evidence because it would have “added needed context” to the quality of defendant's overall care. For example, plaintiff submits that the jury might have concluded that defendant was tired during the surgery or felt rushed to finish it in light of the delayed start time. Similarly, plaintiff asserts that the jury could not fully evaluate whether defendant's general care was reasonable without hearing that she “could not be bothered to follow-up with her own patient” after the surgery.[2] Finally, plaintiff maintains that the prejudicial impact of this missing evidence was exacerbated by the special interrogatory, which she says thrust defendant's “overall care” to the forefront of the case.

¶ 76    One major flaw in plaintiff's position is that the special interrogatory did *not* ask the jury to decide whether defendant's care was reasonable in a “overall” or “general” sense. Neither of those words appear in the special interrogatory. Instead, as plaintiff herself has vigorously argued in challenging the special interrogatory, she was required to prove specific acts of defendant's negligence that proximately caused her injury. Contrary to plaintiff's suggestion, the special interrogatory did not make the case a free-for-all to introduce any and all evidence of defendant's

---

[2] Although plaintiff premises this assertion on a lack of post-operative notes, we observe that both defendant and plaintiff testified that defendant did visit plaintiff in the hospital after the surgery.

actions in this case. Thus, any argument that the excluded evidence was necessary to evaluate defendant's overall care is misplaced.

¶ 77    In a medical malpractice case, the plaintiff must prove (1) the standard of care that the defendant should have provided, (2) that the defendant failed to meet the standard of care, and (3) that the defendant's deviation from the standard of care proximately caused the plaintiff's injuries. *Guerra v. Advanced Pain Centers, S.C.*, 2018 IL App (1st) 171857, ¶ 30. Aside from a few exceptions not relevant here, the plaintiff must prove these elements through expert testimony. *Id.* The element of proximate cause "must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006).

¶ 78    In this case, plaintiff's expert, Dr. Mohling, offered no critique of the surgery's delayed start time. Plaintiff acknowledges as much, conceding that she is "not alleging that the timing of the procedure was negligence in [and] of itself[.]" Similarly, although Dr. Mohling did testify in her deposition that defendant deviated from the standard of care by failing to author post-operative notes, she did not make a causal connection between defendant's conduct and plaintiff's injury. Instead, Dr. Mohling stated that a lack of follow-up *care* could have "[p]ossibly" caused or worsened the injury, but that she "had no idea" what type of injury it would have caused. This speculative testimony is insufficient to establish proximate cause. *Guski*, 409 Ill. App. 3d at 702 (2002) (where there was no testimony that the defendant's failure to document the patient's symptoms caused the patient's death, the trial court was "well within" its discretion to exclude that evidence as irrelevant). Accordingly, we find that the trial court did not abuse its discretion in granting MILs #18 and 22.

¶ 79                                III. CONCLUSION

¶ 80    For the reasons stated, we affirm the judgment of the circuit court.

¶ 81    Affirmed.